CITY OF PROVIDENCE,

        Plaintiff,

vs.

OSHKOSH CORPORATION; PIERCE MANUFACTURING, INC.; TEREX CORPORATION; ROSENBAUER AMERICA LLC; AND FIRE APPARATUS MANUFACTURERS' ASSOCIATION,

        Defendants.

Civil No. 1:26-cv-372

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**DEMAND OF JURY TRIAL**

Plaintiff the City of Providence brings this action under Section 1 of the Sherman Act, Sections 3 and 7 of the Clayton Act, Sections 6-36-4 and 6-36-6 of the Rhode Island Antitrust Act, and Rhode Island common law against Oshkosh Corporation; Pierce Manufacturing, Inc.; Terex Corporation; Rosenbauer America LLC (collectively, the "Manufacturer Defendants"); and Fire Apparatus Manufacturers' Association (collectively, "Defendants"). Plaintiff seeks equitable relief, actual damages, treble damages, restitution, disgorgement, injunctive relief, and civil penalties. Plaintiff demands a trial by jury.

## I.   NATURE OF THE ACTION

1. Fighting fires is a core public safety responsibility of local government. Fire departments respond to a fire roughly every 23 seconds.[1] In 2024, these fires caused approximately 3,920 civilian deaths and an estimated $19 billion in property damage.[2] Firefighters across the

---

[1] Shelby Hall, *Fire loss in the United States*, Nat'l Fire Prot. Ass'n (Oct. 31, 2025), https://web.archive.org/web/20260604065906/https://www.nfpa.org/education-and-research/research/nfpa-research/fire-statistical-reports/fire-loss-in-the-united-states.
[2] *Id.*

country step into this danger on behalf of the public every single day. The fire trucks and other apparatus upon which they rely are critical to their ability to successfully fight fires, save lives, and return home to their families safely.

2. A crisis has been developing within the fire truck manufacturing industry over the last two decades. First, the 2008 recession devastated municipal finances across the country, meaning cities like Providence could no longer afford to replace their aging fire trucks. In 2008, fire departments across the country purchased five thousand new fire trucks, then a record. By 2011, however, financially strapped cities purchased only three thousand new fire trucks.

3. Providence, like most other cities around the country, delayed purchasing new equipment for as long as possible, electing instead to repair and maintain its existing fleet. In 2021 Providence purchased three trucks from Allegiance Fire and Rescue, a dealer for Pierce Manufacturing, a subsidiary of Defendant Oshkosh Corporation, for $449,159 per vehicle.

4. In 2024 Providence purchased five additional trucks of the same model from the same manufacturer, but the price had risen to $734,320—a 63.5% increase in just three years. To make matters worse, Providence's firefighters will have to wait until at least 2027 to receive the new vehicles.

5. Providence experienced similar sticker shock with its purchases of aerial ladder trucks, a critically important piece of firefighting equipment for urban environments. In 2020, one such truck cost $1.3 million. Just a few years later, Providence paid $2 million, almost double the 2020 price, again for substantially similar equipment.

6. Providence's experience is sadly not unique. Emergency and fire departments across the country have faced the same challenges: higher prices and longer delays for critically needed new fire trucks. Nor is the cause a mystery: There has been a historic anticompetitive consolidation in the manufacture and sale of fire trucks.

2

7. As recently as 2015, approximately two dozen independent companies manufactured fire trucks, including nine full-line manufacturers and fifteen limited-line manufacturers. Today, only three companies dominate the industry. Defendant Oshkosh Corporation is responsible for roughly 25% of fire truck sales in the United States. Defendant Terex Corporation, through its recent acquisition of REV Group Inc., is responsible for roughly 33% of such sales. Defendant Rosenbauer has at least 10% of the market. Combined, these three companies control between 70% and 80% of the market.

8. A series of acquisitions spurred this market consolidation. Defendant Terex's predecessor, REV Group, Inc., started the process, acquiring five of its competitors in three transactions between 2016 and 2020. The last of those three companies had itself already acquired two *other* competitors before being swallowed up by REV.

9. Defendant Oshkosh followed REV's lead. In 2020 Oshkosh purchased a partial stake in one competitor and further expanded its empire on June 13, 2022 by acquiring Maxi-Métal, Inc ("Maximetal"), a Canadian competitor. Prior to acquisition, Maximetal had been poised to expand its presence in the United States market.

10. The act of eliminating so many manufacturers alone reduced competition, allowing the remaining players to increase prices and delay deliveries. But making matters worse for customers, the few now-dominant companies further suppressed competition by sharing confidential information through their trade association, the Fire Apparatus Manufacturers' Association ("FAMA"). A committee within FAMA collects confidential information from manufacturer competitors and provides quarterly statistical reports to the manufacturers on what their supposed competitors are doing.

11. The FAMA committee tightly controls access to these reports; the City of Providence, for example, does not have access to this competitively sensitive data about sales and

3

pricing. The FAMA committee guarantees access to the reports only if manufacturers contribute their own competitively sensitive information. The FAMA committee may deny access to any company or individual "that was given the opportunity to participate in the program but refused" or "does not agree in advance of participation to keep participation confidential."[3] By sharing their own competitively sensitive information with their supposed competitors, Defendants can limit incentives to lower prices or expand production, giving Defendants an unfair advantage over their customers.

12. FAMA members meet twice a year to share information, creating additional opportunities for supposed competitors to go beyond sharing information through the FAMA Committee and reach explicit or implicit agreements among themselves to suppress competition.

13. To add insult to injury, Oshkosh, through its subsidiaries, has limited competition for repair parts as well. Through a series of exclusive arrangements with authorized parts dealers, restrictive warranties on purchasers, and its own custom engineering practices, Oshkosh's Pierce subsidiary has all but eliminated the ability of municipalities like the City of Providence to purchase replacement parts for their fire truck fleet from alternative (and more competitively priced) suppliers. Because of these anticompetitive arrangements, the City of Providence must accept Pierce's pricing for replacement parts, paying more to maintain its fleet even after having to pay more to replace its fleet.

14. As alleged herein, these efforts to consolidate, to share competitively sensitive information, and to impose exclusive agreements for parts on dealers have transformed a once vibrant, agile, and competitive manufacturing market into a stagnant and calcified market, one that benefits a small handful of manufacturers at the expense of municipal fire departments trying to

---

[3] *Data & Research Committee*, Fire Apparatus Mfrs. Ass'n,
https://web.archive.org/web/20251214203957/https://www.fama.org/statistics/ (last visited June 9, 2026).

protect their communities as well as taxpayer dollars. For example, in July 2020, the vice president of sales of REV warned his employees, "What I won't tolerate is negative selling. I won't tolerate it with our competitors . . ."[4] In other words, this for-profit manufacturer ordered its employees not to promote the benefits of its products over those of its supposed competitors. In a competitive market, a manufacturer cannot afford to forego pressing any advantage it has over its competitors.

15. The impact this anticompetitive scheme has had on the City of Providence is devastating. Prices for fire trucks on average have doubled over the last decade, and wait times for the new trucks have increased to multiple years in the future. Further, manufacturers, including Oshkosh, force municipalities like Providence to accept escalation clauses that allow the manufacturer to increase the price after the contract has been signed but before delivery, which again can often take years. Municipalities are essentially signing a blank check, bearing the risk of inflation, giving the manufacturer the ability to arbitrarily increase prices, even after they have purchased a truck, and wreaking havoc on city budgets and public safety planning.

16. Despite industry talking points, these price increases are not cost-driven. Oshkosh's operating margin more than doubled in two years, from 4.8% in 2022 to 10.5% in 2024, with a projected operating margin of up to 14% by 2028.[5] As Oshkosh stated in an SEC filing, its increase in margins "was primarily attributable to improved pricing."[6] Terex's profit margins have also increased significantly, with shareholders scheduled to receive a dividend this month[7]; Terex

---

[4] *REV Group Invests in the Strength of Fire Apparatus Brands*, Fire Apparatus & Emergency Equip. Mag. (July 1, 2020), https://web.archive.org/web/20260604152020/https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/.
[5] *Investor Day*, Oshkosh Corp. 83, 86 (June 5, 2026), https://online.flippingbook.com/view/29819025/.
[6] *Annual Report* (Form 10-K), Oshkosh Corp. 34 (Feb. 20, 2025), https://web.archive.org/web/20260611163124/https://www.sec.gov/Archives/edgar/data/775158/000095017025024305/osk-20241231.htm.
[7] *Terex Announces Quarterly Dividend*, Terex Corp. (May 26, 2026) https://web.archive.org/web/20260610005314/https://investors.terex.com/news/news-details/2026/Terex-Announces-Quarterly-Dividend-fc45df5ad/default.aspx.

representatives previously told analysts that it expected other companies' profits would increase as well.[8]

17.     Municipalities like the City of Providence are paying more and waiting longer. Wait times in some areas of the country have more than quadrupled, rising from a one-year lead time to over four years in some instances. Oshkosh reports an increasing backlog. Oshkosh's Vocational segment, which contains its fire truck manufacturing line of business, among others, reported a $3.5 billion backlog as of December 31, 2022. That backlog increased by a staggering 58.4% to $5.46 billion at the end of 2023.[9]  Through December 31, 2024, Oshkosh carried a $6.32 billion backlog for its Vocational segment.[10] Terex and Rosenbauer have similar backlogs,[11] and reports of shortages in replacement parts are commonplace.

18.     These delays are not just a nuisance, as one recent article explains, "they're potentially deadly."[12] Patrick Cleary, President of Chicago's International Association of Fire Fighters ("IAFF") Local 2 expounds "We've had engines go out on calls with faulty brakes and had to crash them into buildings to stop them. We had a crew whose truck broke down and there

---

[8] Mike Baker et al., *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. Times (Feb. 17, 2025), https://www.nytimes.com/2025/02/17/us/fire-engines-shortage-private-equity.html?unlocked_article_code=1.nlA.3QJN._PHFoy37zZ28&smid=url-share.

[9] *Annual Report* (Form 10-K), Oshkosh Corp. 41 (Feb. 29, 2024), https://web.archive.org/web/20250221154431/https://www.sec.gov/Archives/edgar/data/775158/000095017024022841/osk-20231231.htm.

[10] *Annual Report* (Form 10-K), Oshkosh Corp. 40 (Feb. 20, 2025), https://web.archive.org/web/20260610010725/https://www.sec.gov/Archives/edgar/data/775158/000095017025024305/osk-20241231.htm.

[11] *Q1 2026 Earnings Conference Call*, Terex Corp. 9 (May 1, 2026), https://web.archive.org/web/20260610011126/https://s203.q4cdn.com/676879669/files/doc_financials/2026/q1/Terex-Q1-26-Presentation-Final.pdf (reporting a $4.5 billion backlog for Terex's Specialty Vehicles segment, containing its fire truck line of business); *Rosenbauer Group FY 2024 Financial Figures*, Rosenbauer International AG 4 (Apr. 11, 2025), https://web.archive.org/web/20260610011849/https://www.rosenbauer.com/Sharepoint/CorporateCommunications/Documents/Presentations/2024/2024%20Investors%20Presentation%20FY.pdf (reporting a backlog of €2.28 billion, or $2.567 billion based on the exchange rate at the time of the investor presentation).

[12] *Outdated rigs and years-long delays: How the apparatus crisis is hitting IAFF members on the ground*, Int'l Ass'n of Fire Fighters (Oct. 3, 2025), https://web.archive.org/web/20260610012443/https://www.iaff.org/news/outdated-rigs-and-years-long-delays-how-the-apparatus-crisis-is-hitting-iaff-members-on-the-ground/.

were no spares available, so our members were just sitting in the firehouse for days with nothing to do …We had a tower ladder stop working during a call and were forced to waste valuable time resetting it. Four people died at that fire."[13]

19.     In Las Cruces, New Mexico, the President of IAFF Local 2362 describes the crisis they face: "Our vehicles are so old at this point that you're not even able to order new parts for a lot of them." Although the city has the funds to upgrade their fleet, they can't because of the delays. The delays have forced the city "to totally rewrite its budget process to account for the long delivery delays, and they're now having to project funding three to four years out."[14]

20.     What is bad for the City of Providence is good for the manufacturers. For example, in 2022, Oshkosh's CEO described the company's nearly $660 million quarterly Fire & Emergency vehicles backlog as "another record."[15] The very next quarter, he elatedly reported to Wall Street investors that "[w]e have the strongest backlog we've ever had in Fire & Emergency."[16]

21.     As one manufacturer explained, delays in delivery were unlikely to lead to cancelations of orders. Indeed, the same manufacturer, in an SEC filing, explained backlogs as a benefit: "[C]ertain of our businesses carry a relatively long-duration backlog which enables strong visibility into future net sales. Where this backlog visibility exists, we are able to more effectively plan and predict our sales and production activity."[17] With price escalation clauses in place to

---

[13] *Id.*
[14] *Id.*
[15] *Oshkosh Corporation (OSK) CEO John Pfeifer on Q1 2022 Results – Earnings Call Transcript*, Seeking Alpha (Apr. 27, 2022), https://web.archive.org/web/20220427171643/https://seekingalpha.com/article/4504088-oshkosh-corporation-osk-ceo-john-pfeifer-on-q1-2022-results-earnings-call-transcript.
[16] *Earnings Call Transcript*, Alpha Spread (July 28, 2022), https://web.archive.org/web/20220802130451/https://seekingalpha.com/article/4527114-oshkosh-corporation-osk-ceo-john-pfeifer-on-q2-2022-results-earnings-call-transcript.
[17] *Annual Report* (Form 10-K), REV Group, Inc. 11 (Dec. 10, 2025), https://web.archive.org/web/20260605224119/https://www.sec.gov/Archives/edgar/data/1687221/000119312525313470/revg-20251031.htm.

7

protect these manufacturers from future price uncertainty, the cost of these delays is borne solely by purchasers like the City of Providence.

22. In a competitive market, massive delays like these would be a death knell for a company as competitors would step up production to fill the void. Here, the industry's response has been laconic at best. Terex even closed plants in 2021.[18] A former Terex investor said the quiet part aloud: "How can you have a $4 billion backlog and not spend any money to support it. It's reflective of an uncompetitive market."[19]

23. The City of Providence cannot avoid the harms inflicted by this market transformation. The City is paying more, to wait longer to upgrade and modernize its fleet, while fires do not stop and emergencies continue to demand action to save lives and property.

24. Oshkosh's acquisition of Maxi Metal may have, and did, substantially reduce competition in this market to the detriment of the City. Further, the Manufacturer Defendants' active and ongoing participation in FAMA's information sharing has served to further suppress competition, also to the detriment of the City. And the exclusive agreements between Oshkosh subsidiaries and third-party parts dealers have increased the prices Providence must pay for those parts. These actions violate Sections Three and Seven of the Clayton Act, Section One of the Sherman Act, and each of the corresponding provisions of the Rhode Island Antitrust Act.

25. The City of Providence brings this action to (i) recover the damages it has suffered from those violations, trebled as permitted by statute, and (ii) obtain injunctive relief to address these harms and restore competition, including but not limited to divesture of Oshkosh's

---

[18] Mike Baker et al., *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. Times (Feb. 17, 2025), https://www.nytimes.com/2025/02/17/us/fire-engines-shortage-private-equity.html?unlocked_article_code=1.nlA.3QJN._PHFoy37zZ28&smid=url-share.
[19] *Id.*

8

Maximetal's assets, prohibitions on all Defendants from sharing confidential information, an end to exclusive repair parts contracts, and any other relief the Court deems necessary.

## II.  PARTIES

### A.  Plaintiff City of Providence

26.  Plaintiff City of Providence is a municipal corporation organized pursuant to Rhode Island state law.  The City of Providence is a political subdivision of the State of Rhode Island and derives its powers through the state constitution, state laws, and its home-rule charter.

27.  Providence is the state capital of Rhode Island and the largest city in the state.

28.  The Providence Fire Department is the second oldest continuously operating paid professional fire department in the United States.[20]

29.  The Department handles approximately 46,000 calls a year, or roughly one call every 12 minutes.  Within the Department, the busiest fire engine companies respond to approximately 5,800 calls per year (over sixteen calls per day), while the busiest ladder truck companies respond to approximately 3,200 calls per year (nearly nine calls per day).  Routine calls to the Fire Department require the response of at least a single fire engine; a more complicated call involving a structure fire requires the response of at least three engines and two ladder companies.[21]

### B.  Defendants Oshkosh Corporation and Pierce Manufacturing, Inc.

30.  Oshkosh Corporation ("Oshkosh") is a corporation organized under the laws of the State of Wisconsin with its principal place of business in Oshkosh, Wisconsin.[22]

---

[20] *Your Providence Fire Department*, City of Providence, https://web.archive.org/web/20260604090226/https://pfd.providenceri.gov/your-providence-fire-department/ (last visited June 4, 2026).
[21] *Call Types and Response Plan (Revised)*, Providence Fire Dep't at 1 (Nov. 3, 2023).
[22] *Annual Report* (Form 10-K), Oshkosh Corp. 1 (Feb. 20, 2025), https://web.archive.org/web/20260610010725/https://www.sec.gov/Archives/edgar/data/775158/000095017025024305/osk-20241231.htm.

9

31.    Oshkosh is a global company which "specialize[s] in the design, development and manufacturing of purpose-built vehicles and equipment" catering to "postal, firefighting, refuse and recycling collection, construction, aviation and defense industries."[23]

32.    Oshkosh operates and sells its products under numerous brand names, including JLG Industries, Inc.; JerrDan LLC; Hinowa S.p.A; AUSACORP S.L.; Pierce Manufacturing Inc.; Oshkosh AeroTech; McNeilus Companies, Inc.; Oshkosh Commercial Products, LLC; Iowa Mold Tooling Co., Inc.; and Maxi-Métal Inc.; Kewaunee Fabrications, LLC; Oshkosh Defense, LLC; and Pratt & Miller Engineering & Fabrications, LLC.[24]

33.    Oshkosh categorizes its lines of business into three segments: Access, Vocational, and Defense.  Oshkosh's Vocational segment includes its lines of business that design and manufacture commercial and custom fire apparatus.[25]

34.    Oshkosh's leading North American fire truck brand is Pierce Manufacturing, Inc. ("Pierce").  Pierce describes itself as the "leading North American manufacturer of custom fire apparatus. Products include custom and commercial pumpers, aerials, rescue trucks, wildland trucks and tankers."[26] Pierce is incorporated in Delaware and is headquartered in Appleton, Wisconsin.[27]  It produces custom and commercial pumpers, aerials, rescue trucks, wildland trucks, mini pumpers, and other fire apparatus in its manufacturing facilities in Appleton, Wisconsin and Bradenton, Florida.[28]  Pierce advertises 19 dealers across California, Colorado, Florida, Kansas,

---

[23] *Id.* at 1.
[24] *Id.* at 50.
[25] *Id.* at 50.
[26] *Fire Truck Manufacturing: The Steps Required to Build Custom Apparatus*, Pierce Mfg. (Feb. 20, 2025), https://web.archive.org/web/20251014142440/https://www.piercemfg.com/pierce/blog/fire-truck-manufacturing-steps-build-custom-apparatus.
[27] Pierce Manufacturing Inc., State of Wis. Dep't of Fin. Insts., 1P05236 https://web.archive.org/web/20260604024908/https://apps.dfi.wi.gov/apps/corpsearch/Details.aspx?entityID=1P05236&hash=1972778546&searchFunctionID=9e7728c8-4a74-4be9-b08b-78df546d562e&type=Simple&q=pierce+manufacturing (last visited June 3, 2026).
[28] *About Us*, Pierce Mfg., https://web.archive.org/web/20260604040519/https://www.piercemfg.com/pierce/about-us (last visited June 3, 2026).

Massachusetts, Minnesota, New Jersey, New York, Oregon, Pennsylvania, South Carolina, Texas, Virginia, and Wisconsin.[29] Together, this dealer network sells fire trucks to customers in all 50 states.[30]

35. Oshkosh, including through Pierce, captures around $750 million in annual fire truck sales in the United States, or at least 25% of the total.[31] Oshkosh's Vocational Segment, of which Pierce is a component, reported net sales of $3.727 billion in 2025, an increase of 12.6% from $3.31 billion in net sales in 2024.[32] Oshkosh explicitly attributes $157 million of this increase in net sales to "improved pricing."[33] Beyond simply increasing its net sales, Oshkosh managed to increase the margins of its Vocational Segment sales from 12% in 2024 to 14.7% in 2025.[34]

## C.     Defendant Terex Corporation

36. Terex Corporation ("Terex") is a corporation organized under the laws of the State of Delaware with its principal place of business in Norwalk, Connecticut.[35]

---

[29] *Find a Dealer*, Pierce Mfg., https://web.archive.org/web/20260506025517/https://www.piercemfg.com/Find-A-Dealer (last visited June 9, 2026).
[30] *Benefits of a Strong Fire Apparatus Dealer Network*, Pierce Mfg. (Sept. 8, 2025), https://web.archive.org/web/20260605224518/https://www.piercemfg.com/pierce/blog/fire-apparatus-dealer-benefits.
[31] Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*, BIG by Matt Stoller (Jan. 25, 2025), https://web.archive.org/web/20260604052955/https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll.
[32] *Annual Report* (Form 10-K), Oshkosh Corp. 32 (Feb. 17, 2026), https://web.archive.org/web/20260610024542/https://www.sec.gov/Archives/edgar/data/775158/000119312526054061/osk-20251231.htm.
[33] *Id.*
[34] *Id.*
[35] *Annual Report* (Form 10-K), Terex Corp. 1 (Feb. 13, 2026), https://web.archive.org/web/20260530010733/https://www.sec.gov/Archives/edgar/data/97216/000009721626000035/tex-20251231.htm.

11

37. In February of this year, Terex completed its merger with REV Group, Inc. ("REV"),[36] the entity that had itself acquired numerous independent fire truck manufacturers under its own roof as described *supra*.[37]

38. Because of the recency of the merger between Terex and REV, allegations in this Complaint may be made in reference to conduct undertaken by REV prior to the transaction. Further, the merged entities have not yet fully consolidated public-facing communications; cited sources may be to REV's website or other REV-published materials. As the surviving entity, Terex bears liability for the acts undertaken by REV prior to ratification of the transaction.[38]

39. Terex manufactures fire trucks under multiple brand names consolidated under REV, including: E-ONE, Inc. ("E-ONE"); Kovatch Mobile Equipment Corporation ("KME"); Ferrara Fire Apparatus ("Ferrara"); Spartan Emergency Response and Spartan Fire Apparatus and Chassis (collectively, "Spartan"); Smeal Fire Apparatus ("Smeal"); and Ladder Tower Company ("Ladder Tower").[39] One hundred and thirteen dealers nationwide sell fire trucks from these

---

[36] *Terex And Rev Group Complete Merger, Creating a Premier Specialty Equipment Manufacturer*, PR Newswire, https://web.archive.org/web/20260604095418/https://www.prnewswire.com/news-releases/terex-and-rev-group-complete-merger-creating-a-premier-specialty-equipment-manufacturer-302675744.html (last visited June 4, 2026).

[37] Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*, BIG by Matt Stoller (Jan. 25, 2025), https://web.archive.org/web/20260604052955/https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll.

[38] *Agreement and Plan of Merger*, REV Group, Inc and Terex Corp. 91 (Oct. 29, 2025), https://web.archive.org/web/20251030122011if_/https://www.sec.gov/Archives/edgar/data/97216/000110465925104013/tm2529764d1_ex2-1.htm
 ("This Agreement and any Action arising out of or relating to this Agreement or the transactions contemplated hereby . . . shall be governed and construed in accordance with the Laws of the State of Delaware[…].”); Del. Code Ann. Tit. 8, § 259 ("[A]ll debts, liabilities and duties of the respective constituent corporations shall thenceforth attach to said surviving or resulting corporation, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it.").

[39] *Annual Report* (Form 10-K), REV Group, Inc. 5, (Dec. 10, 2025) https://web.archive.org/web/20260605224119/https://www.sec.gov/Archives/edgar/data/1687221/000119312525313470/revg-20251031.htm.

12

brands across all 50 states.[40]  Additionally, Terex sells Spartan cabs and chassis to approximately 40 smaller builders.[41]

40.     Terex currently operates manufacturing plants in Ocala, Florida (E-ONE apparatus); Hamburg, New York (stainless steel E-ONE products); Nesquehoning, Pennsylvania (KME apparatus); Ephrata, Pennsylvania (Ladder Tower, KME, and Ferrara apparatus); Brandon, South Dakota (Spartan pumpers); Charlotte, Michigan (Spartan cabs and chassis); Snyder, Nebraska (Smeal apparatus); and Holden, Louisiana (Ferrara apparatus).[42]

41.     Of the roughly $3 billion in annual fire truck sales in the United States, Terex captures approximately $1 billion, or at least 33% of the total.[43]  In FY2025, REV's net income was $95.2 million.[44]

**D.     Defendant Rosenbauer America, LLC**

42.     Rosenbauer America, LLC ("Rosenbauer") is a wholly owned subsidiary of Rosenbauer International AG ("Rosenbauer International"), a publicly traded company based in Austria and listed on the Vienna Stock Exchange.[45]  Rosenbauer is incorporated under the laws of the State of Delaware[46] with its principal place of business in Lyons, South Dakota.[47]  Rosenbauer

---

[40] *REV Group Invests in the Strength of Fire Apparatus Brands*, Fire Apparatus & Emergency Equip. Mag. (July 1, 2020), https://web.archive.org/web/20260604152020/https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/.

[41] *Id.*

[42] *Who We Are*, REV Group, Inc., https://web.archive.org/web/20260604064935/https://revgroup.com/who-we-are/ (last visited June 9, 2026).

[43] Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*, BIG by Matt Stoller (Jan. 25, 2025), https://web.archive.org/web/20260604052955/https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll.

[44] *Annual Report* (Form 10-K), REV Group, Inc. 37 (Dec. 10, 2025), https://web.archive.org/web/20260604155854/https://www.sec.gov/Archives/edgar/data/1687221/000119312525313470/revg-20251031.htm.

[45] *Rosenbauer International fully acquires Rosenbauer America*, Rosenbauer Int'l AG (June 23, 2022), https://web.archive.org/web/20260604104848/https://www.rosenbauer.com/en/company/investor-relations/financial-news/2022/06/rosenbauer-international-fully-acquires-rosenbauer-america.

[46] *Rosenbauer America, LLC*, Del. Dep't of State, Div. of Corps. 2885031 (database updated 2026).

[47] *General Info, Rosenbauer America, LLC*, Fire Apparatus Mfrs. Ass'n, https://web.archive.org/web/20251010135701/https://www.fama.org/members/company_profile/?id=99 (last visited June 10, 2026).

America LLC is the holding company for the Rosenbauer Group's North American business, consolidating the production companies Rosenbauer South-Dakota LLC, Rosenbauer Minnesota LLC, Rosenbauer Motors LLC, and Rosenbauer Aerials LLC.[48]

43. Rosenbauer has production facilities in Lyons, South Dakota; Wyoming, Minnesota; and Fremont, Nebraska.[49] Rosenbauer produces custom and commercial pumpers, heavy rescues, tenders, mini pumpers and light rescues, aerial ladders and platforms, and electric fire trucks.[50]

44. Rosenbauer captures approximately $282.6 million in United States fire apparatus sales annually, or at least 10% of the market.[51]

**E.     Defendant Fire Apparatus Manufacturers' Association**

45. The Fire Apparatus Manufacturers' Association ("FAMA") is a nonstock corporation organized under the laws of the Commonwealth of Virginia with its principal place of business in Ocala, Florida. FAMA describes itself as a not-for-profit trade association.[52]

---

[48] *Rosenbauer International fully acquires Rosenbauer America*, Rosenbauer Int'l AG (June 23, 2022), https://web.archive.org/web/20260604104848/https://www.rosenbauer.com/en/company/investor-relations/financial-news/2022/06/rosenbauer-international-fully-acquires-rosenbauer-america.
[49] *Locations, Rosenbauer America*, Rosenbauer Int'l AG, https://web.archive.org/web/20260604163950/https://www.rosenbauer.com/en/contact/locations/america (last visited June 10, 2026).
[50] *Rosenbauer America, LLC General Info*, Fire Apparatus Mfrs. Ass'n, https://web.archive.org/web/20250903222243/https://www.fama.org/members/company_profile/?id=99 (last visited June 4, 2026).
[51] *Rosenbauer International fully acquires Rosenbauer America*, Rosenbauer Int'l AG (June 23, 2022), https://web.archive.org/web/20260604104848/https://www.rosenbauer.com/en/company/investor-relations/financial-news/2022/06/rosenbauer-international-fully-acquires-rosenbauer-america (reporting annual business volume of € 262.9 million, or $282.6 million based on the exchange rate at the time of the release); Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*, BIG by Matt Stoller (Jan. 25, 2025), https://web.archive.org/web/20260604052955/https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll.
[52] *Mission*, Fire Apparatus Mfrs. Ass'n, https://web.archive.org/web/20260604105933/https://www.fama.org/mission/ (last visited June 4, 2026).

14

46.     As of May 2025, FAMA had approximately 135 member companies, including 55 manufacturer members,[53] including Terex subsidiaries (E-ONE, Ferrara, Spartan, and KME), Oshkosh subsidiaries (Pierce and Maximetal), and Rosenbauer.

47.     Employees of the Manufacturing Defendants serve in various leadership positions within FAMA.  For example, John Schultz, the Vice President and General Manager of Pumper Products for Pierce,[54] serves as the Vice Chair of FAMA's Data & Research Committee, the mission of which is to "help strengthen FAMA member companies by providing actionable data for strategic business planning," including "economic data, fire market trends, and apparatus sales and order statistics."[55]

48.     FAMA acted as a co-conspirator of the Manufacturer Defendants by facilitating the exchange of confidential, proprietary, and competitively sensitive data among them.

49.     Manufacturer Defendant executives regularly serve on the FAMA Board of Directors, as demonstrated in the figure below.

---

[53] *FAMA Releases Fire Apparatus Industry Update*, Fire Eng'g (May 30, 2025), https://web.archive.org/web/20260604110152/https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update/.

[54] *John Schultz*, Pierce Mfg, Inc., https://web.archive.org/web/20251110153742/https://www.piercemfg.com/hubfs/FDIC%202025/Bios/Bio/John%20Schultz%20-%20Pierce%20Manufacturing.pdf (last visited June 4, 2026).

[55] *Data and Research Committee*, Fire Apparatus Mfrs. Ass'n, https://web.archive.org/web/20250822170455/https://www.fama.org/data-research-committee/ (last visited June 4, 2026).



# 2022 Board of Directors




Past President – Andrew Lingel
United Plastic Fabricating, Inc.



President – Oran McNabb
AMDOR, Inc.



Vice President – Bert McCutcheon
Ferrara Fire Apparatus



Treasurer – Gary Pacilio
E-ONE, Inc.



Secretary – Ron Truhler
H.O. Bostrom Company, Inc.



Director-at-Large – Jason Darley
Darley



Director-at-Large – Bill Doebler
HME Ahrens-Fox

*Fig. 1: FAMA 2022 Board of Directors, Featuring Ferrara and E-One Executives*[56]

## III.  FACTUAL ALLEGATIONS

**A.  Until Recently, the Fire Truck Industry Was a Competitive, Fragmented Market with Independent Manufacturers**

50.  In the post-war decades of the 1950s and 1960s, the fire truck industry was composed of numerous manufacturers dispersed throughout every region of the country. These manufacturers, which were typically family-owned entities, created fire trucks tailored to the needs and specifications of the local fire departments and the municipalities they served. The fragmented

---

[56] *2022 Spring Meeting*, Fire Apparatus Mfrs. Ass'n 19, https://web.archive.org/web/20251214210914/https://www.fama.org/wp-content/uploads/2022/03/1646772045_6227bf4d537dc.pdf (last visited June 4, 2026).

16

market served to keep prices for fire trucks low, and the large number of manufacturers created greater output capacity, ensuring that demand for this critical public safety equipment was met.[57]

51.     For decades, the industry enjoyed relatively stable, inflation-adjusted prices, consistently increasing at approximately 3-5% annually.[58]

52.     This thriving, competitive industry lasted well into the 2000s. In 2008, the industry hit its high-water mark, selling over 5,000 new fire trucks in the United States that year.[59] As the Great Recession took its toll on municipal budgets, this number collapsed and hit the low point of approximately 3,000 new fire trucks sold in the United States in 2011.[60] Fire truck purchases did not return to their pre-Recession levels until well into the late 2010s.[61]

53.     As late as 2015, there remained approximately two-dozen companies producing fire trucks in the U.S., including nine full-line manufacturers and fifteen limited-line manufacturers.[62] All 24 of these manufacturers were either independent or owned by separate parent entities.[63]

### B.     REV, Oshkosh, and Rosenbauer Consolidate Through Acquisitions

### i.     AIP and REV Group

54.     During the fire truck industry's downturn, a private equity firm, American Industrial Partners ("AIP"), sought to establish itself within the industry. AIP strategized that family-owned, incumbent firms facing declining sales and aging leadership would be willing to

---

[57] Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*, BIG by Matt Stoller (Jan. 25, 2025), https://web.archive.org/web/20260604052955/https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll.

[58] *The Apparatus Architect: Challenging 'Times' for Apparatus Purchasing*, Firehouse (Mar. 14, 2022), https://web.archive.org/web/20250526021956/https://www.firehouse.com/apparatus/article/21254445/the-apparatus-architect-challenging-times-for-apparatus-purchasing.

[59] *The Fire Apparatus Market is Coming Back… Just Look at the Data*, Fire Apparatus Mfrs. Ass'n (Dec. 4, 2015), https://web.archive.org/web/20260604150729/https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data/.

[60] *Id.*

[61] *Id.*

[62] *What a Competitive Strategy Analyst Thinks About the Fire Apparatus Industry*, Fuld & Co., https://web.archive.org/web/20251206152415/https://www.fuld.com/what-a-competitive-strategy-analyst-thinks-about-the-fire-apparatus-industry/ (last visited June 10, 2026).

[63] *Id.*

sell their companies at discounted prices.[64]  However, contrary to this assumption, most of the companies held out and did not sell.  The only fire truck manufacturer that AIP was initially able to acquire was E-ONE in 2008.[65]  E-ONE, an Ocala, Florida-based manufacturer, builds "fire rescue vehicles including aerials, pumpers, rescues, mobile command centers, and aircraft rescue fire fighting (ARFF) vehicles."[66]



*Fig. 2:  REV's Acquisition Timeline*[67]

55.    In 2010, AIP created Allied Specialty Vehicles,[68] a conglomerate holding company into which it bundled its fire truck acquisitions, along with ambulance, bus, recreational, and other

[64] Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*, BIG by Matt Stoller (Jan. 25, 2025), https://web.archive.org/web/20260604052955/https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll.

[65] *American Industrial Partners Announces Acquisition of E-ONE, Inc., A Subsidiary of Federal Signal Corporation*, Am. Indus. Partners (Aug. 5, 2008), https://web.archive.org/web/20260610235333/https://americanindustrial.com/news/american-industrial-partners-announces-acquisition-of-e-one-inc-a-subsidiary-of-federal-signal-corporation/.

[66] *Id.*

[67] *REV Group, Inc. Presentation*, REV Group, Inc. 6 (July 2021), https://web.archive.org/web/20260308014532/https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf.

[68] *REV Group sets itself apart*, BUSRide (July 1, 2018), https://web.archive.org/web/20260604153240/https://busride.com/rev-group-sets-itself-apart/.

specialty vehicle manufacturers.[69] AIP subsequently renamed Allied Specialty Vehicles as REV Group, Inc. in 2015.[70]

56. In 2016, REV commenced its serial roll-up of the industry in earnest. That year, REV acquired Kovatch Mobile Equipment Corp. ("KME"). KME, a company that had been a family-owned enterprise since 1946, was headquartered in and operated its primary manufacturing facility in Nesquehoning, Pennsylvania. KME had additional facilities in Roanoke, Virginia; Ontario, California; Albany, New York; and Rockaway, New Jersey, along with an extensive independent dealer network.[71]

57. In 2017, REV next acquired Ferrara Fire Apparatus, Inc. ("Ferrara"), a company headquartered in Holden, Louisiana.[72] Prior to the acquisition, Ferrara acted as E-ONE's primary competitor in the Southern United States.[73] Ferrara's product portfolio included custom builds on their own chassis, client-tailored builds on commercially available chassis, pumpers, aerials, and industrial apparatus.[74]

58. In February 2020, REV purchased Spartan Emergency Response and its brands, Spartan Fire Apparatus and Chassis (collectively, "Spartan"), Smeal Fire Apparatus ("Smeal"),

---

[69] Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*, BIG by Matt Stoller (Jan. 25, 2025), https://web.archive.org/web/20260604052955/https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll.

[70] *REV Group sets itself apart*, BUSRide (July 1, 2018), https://web.archive.org/web/20260604153240/https://busride.com/rev-group-sets-itself-apart/.

[71] *KME Fire Apparatus Sold to REVGROUP*, Firehouse (Apr. 11, 2018), https://web.archive.org/web/20251110155344/https://www.firehouse.com/apparatus/press-release/12193362/fire-apparatus-manufacturer-kme-kovtach-pumpers-aerials-heavy-rescue-fire-apparatus-builder-kme-fire-apparatus-sold-to-revgroup.

[72] *REV Group Acquires Ferrara Fire Apparatus, Inc.*, REV Group, Inc. (Apr. 25, 2017), https://web.archive.org/web/20251110161333/https://investors.revgroup.com/investor-releases/2017/04-25-2017-182251523.

[73] Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*, BIG by Matt Stoller (Jan. 25, 2025), https://web.archive.org/web/20260604052955/https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll.

[74] *REV Group Acquires Ferrara Fire Apparatus, Inc.*, REV Group, Inc. (Apr. 25, 2017), https://web.archive.org/web/20251110161333/https://investors.revgroup.com/investor-releases/2017/04-25-2017-182251523.

19

Ladder Tower Company ("Ladder Tower"), and U.S. Tanker Fire Apparatus, Inc. ("UST").[75]  As

of September 30, 2019, Spartan had generated net revenues of $253.3 million in the twelve months

immediately preceding.[76]  This particular acquisition of Spartan presented one notable efficiency

for REV: Spartan and its subsidiary, Smeal, had already performed substantial consolidation.  In

June of 2014, Smeal acquired both UST and Ladder Tower.  The UST acquisition added UST's

stainless-steel custom and commercial tankers, tenders, steel pumpers with custom and

commercial chassis, light rescues, mini-pumpers, and brush trucks to Smeal's full line of custom

and commercial pumpers and "the largest selection of aerial apparatus models in the fire

industry."[77]  The Ladder Tower acquisition added its line of ladders, platforms and tractor-drawn

aerials, boom ladders, and articulating aerial platforms to Smeal's portfolio—an acquisition which

"add[ed] an extensive line of aerial apparatus to [Smeal's] already expansive line of industry-

leading steel aerial ladders, platforms, and tillers."[78]  Spartan subsequently acquired Smeal in

January 2017,[79] only to then be acquired three years later by REV.  These acquisitions ensured that

REV was the dominant manufacturer of fire trucks within the United States.

---

[75] *REV Group, Inc. Completes Acquisition of Spartan Emergency Response*, Fire Apparatus & Emergency Equip.
Mag. (Feb. 3, 2020), https://web.archive.org/web/20260605153029/https://www.fireapparatusmagazine.com/the-
fire-station/the-station-news/rev-group-inc-completes-acquisition-of-spartan-emergency-response/.
[76] *Id.*
[77] *Smeal Fire Apparatus Co Acquires UST Fire Apparatus*, Fire Eng'g (June 19, 2014),
https://web.archive.org/web/20260604155347/https://www.fireengineering.com/fire-apparatus/smeal-fire-apparatus-
co-acquires-ust-fire-apparatus/.
[78] *Smeal Fire Apparatus Acquires LTI Aerial Assets*, Fire Apparatus & Emergency Equip. Mag. (June 12, 2014),
https://web.archive.org/web/20260611001930/https://www.fireapparatusmagazine.com/fire-apparatus/ladder-
trucks/smeal-fire-apparatus-acquires-lti-aerial-assets/.
[79] *Spartan Motors to Acquire Fire Apparatus Maker Smeal*, PR Newswire (Dec. 13, 2016),
https://web.archive.org/web/20260604155703/https://www.prnewswire.com/news-releases/spartan-motors-to-
acquire-fire-apparatus-maker-smeal-300376962.html.

20



*Fig. 3: REV-Owned Fire Truck Manufacturer Brands*[80]

59.     Initially, REV executives appeared to allow their subsidiaries to maintain some level of independence from other brands and lines of business within the company.  However, REV executives simultaneously signaled to their subsidiaries that aggressive—or "negative"—competition among subsidiaries would not be tolerated.[81]  By 2021, executives dropped all pretense.  In September of that year, KME's plants were shut down under a new "platforming" and "channel management" strategy.[82]  Around that same time, a REV investor presentation showed the platforming strategy called for REV subsidiaries to "[c]onverge on common designs that can be shared across brands," and to use Spartan's Metro Star chassis/cab as the "platform" for their fire truck offerings.  The same presentation showed that "channel management" entailed eliminating existing manufacturing and dealership overlap between subsidiary brands.[83]  These changes—led through a central management nucleus in REV—had the effect of reducing consumer choice and options from among these brands, as well as reducing output capacity.  The two KME plants that REV closed in 2021 as part of its streamlining efforts cut the company's manufacturing footprint by roughly one third.[84]

---

[80] *REV Group, Inc. Presentation*, REV Group, Inc. 9 (July 2021), https://web.archive.org/web/20260308014532/https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf.

[81] Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*, BIG by Matt Stoller (Jan. 25, 2025), https://web.archive.org/web/20260604052955/https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll.

[82] Mike Baker et al., *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. Times (Feb. 17, 2025) https://www.nytimes.com/2025/02/17/us/fire-engines-shortage-private-equity.html?unlocked_article_code=1.nlA.3QJN._PHFoy37zZ28&smid=url-share.

[83] *Investor & Analyst Day*, REV Group, Inc. 28 (Apr. 15, 2021), https://web.archive.org/web/20260412004301/https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-investor-day-v18.pdf.

[84] Mike Baker et al., *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. Times (Feb. 17, 2025) https://www.nytimes.com/2025/02/17/us/fire-engines-shortage-private-equity.html?unlocked_article_code=1.nlA.3QJN._PHFoy37zZ28&smid=url-share.

21



*Fig. 4: REV's Platforming Strategy for Spartan Metro Star Chassis/Cab*[85]

---

[85] *Investor & Analyst Day*, REV Group, Inc. 32 (Apr. 15, 2021),
https://web.archive.org/web/20260412004301/https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-investor-day-v18.pdf.



***Fig. 5: Case Study of Rev's "Channel Management" Strategy,
as Applied to Its Ambulance Line of Business***[86]

60. At the time of the acquisitions, Timothy Sullivan, REV's chief executive, told analysts that the goal was to make the acquired companies more efficient. The companies were operating with a profit of 4 to 5 percent but would be put on a path, Sullivan said, "to get all of them above that 10 percent level." He stated, "You bring them into the fold, you got to give them the religion, and they've got it now."[87]

### ii. Oshkosh and Pierce

61. Following REV's serial roll-up, competing manufacturer Oshkosh staked out its own acquisitions.

---

[86] *Investor & Analyst Day*, REV Group, Inc. 23 (Apr. 15, 2021), https://web.archive.org/web/20260412004301/https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-investor-day-v18.pdf.

[87] Mike Baker et al., *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. Times (Feb. 17, 2025) https://www.nytimes.com/2025/02/17/us/fire-engines-shortage-private-equity.html?unlocked_article_code=1.nlA.3QJN._PHFoy37zZ28&smid=url-share.

62.     In September 2021, Oshkosh announced that, through its wholly owned subsidiary Pierce, it had completed its purchase of an ownership interest in Boise Mobile Equipment ("BME"), a Boise, Idaho-based manufacturer that predominantly served jurisdictions purchasing equipment to fight wildland fires.  The move also enabled Pierce to expand its operations on the West Coast, a market already served by BME.[88]

63.     On June 13, 2022, Oshkosh announced that it had completed the acquisition of Maxi-Métal Inc. ("Maximetal"), a Quebec-based manufacturer.  The announcement indicated that Oshkosh's primary interest in the acquisition was to expand its operations in Canada and to "expand[] sales and distribution capabilities within Pierce's North American dealer network."[89]

64.     Prior to being acquired by Oshkosh, Maximetal and Pierce engaged in a strategic partnership.  Pierce developed a product using its Saber chassis line with Maximetal's firefighting features designed for the Canadian market.  Likewise, Maximetal began building pumpers and tankers on commercial chassis for the U.S. market, distributed through Pierce's U.S. dealer network.[90]  But even while engaging in a manufacturing and distributing partnership, the two entities were still free to engage in price competition to obtain contracts with municipalities.  Thus, the acquisition of Maximetal deprived the market of an additional competitor.

65.     After these expansions, Oshkosh controlled approximately 25% of the U.S. fire truck manufacturing market.

---

[88] *Pierce Completes Ownership Interest in BME*, Firehouse (Sept. 16, 2021), https://web.archive.org/web/20251111150312/https://www.firehouse.com/apparatus/press-release/21238596/pierce-manufacturing-custom-fire-truck-builder-pumpers-ladders-quints-rescues-puc-enforcer-pierce-completes-ownership-interest-in-bme.

[89] *Oshkosh Corporation acquires Maxi-Métal Inc.*, Oshkosh Corp. (June 13, 2022), https://web.archive.org/web/20260604161043/https://www.oshkoshcorp.com/news/2022/6-13-22-maxi-metal.

[90] *About us*, Maxi-Métal, Inc., https://web.archive.org/web/20260604161258/https://www.maximetal.com/about-us/pierce-partnership/ (last visited June 10, 2026).

24

66.     In addition to Oshkosh's acquisitions, the manufacturer's territory-exclusive independent dealerships and service centers have undergone substantial consolidation, increasing the geographic footprint for each of these dealerships and reducing overlap, thereby restricting customers' ability to price shop within the brand.

67.     In July 2018, Pierce dealership MacQueen Emergency Group, based out of St. Paul, Minnesota, acquired Schuhmacher Fire Equipment, a Missouri-based Pierce dealer.  Prior to the acquisition, MacQueen was the authorized dealer for Minnesota, Nebraska, South Dakota, and North Dakota.  The acquisition of Schuhmacher added 109 counties within the State of Missouri to MacQueen's territory; the remaining five Missouri counties remained under the control of Conrad Fire Equipment, Inc., another Pierce dealer.[91]

68.     In November 2019, Pierce announced that Allegiance Fire and Rescue, a division of Allegiance Trucks, LLC, had acquired Minuteman Fire and Rescue, Pierce's authorized dealer. The acquisition conveyed the territory controlled by Minuteman to Allegiance, including Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.[92]

69.     In January 2020, Pierce announced that its authorized dealer, Siddons-Martin Emergency Group, had acquired Superior Equipment.  Prior to the acquisition, Siddons-Martin held territory exclusivity for Texas, New Mexico, and Louisiana.  The acquisition of Superior Equipment added Utah and Nevada—excluding Clark County—to its territory.[93]

---

[91] *MacQueen Emergency Group Territory Expanded to Include 109 Missouri Counties*, Pierce Mfg., Inc. (July 10, 2018), https://web.archive.org/web/20260604161630/https://www.piercemfg.com/pierce/press-release/macqueen-emergency-group-territory-expanded-to-include-109-missouri-counties.
[92] *Minuteman Fire and Rescue Acquired by Allegiance Fire and Rescue*, Pierce Mfg., Inc. (Nov. 18, 2019), https://web.archive.org/web/20220626055641/https://www.piercemfg.com/pierce/press-release/minuteman-fire-and-rescue-acquired-by-allegiance-fire-and-rescue.
[93] *Siddons-Martin Emergency Group Expands Territory with Acquisition of Superior Equipment*, Pierce Mfg., Inc. (Jan. 21, 2020), https://web.archive.org/web/20260604162107/https://www.piercemfg.com/pierce/press-release/siddons-martin-emergency-group-expands-territory-with-acquisition-of-superior-equipment.

25

70. In April 2023, Pierce announced that Siddons-Martin Emergency Group acquired yet another dealership, Emergency Vehicle Specialists.[94] The acquisition expanded Siddons-Martin's territory to include Arkansas and Tennessee, in addition to the five states it controlled following its acquisition of Superior Equipment in 2019, *supra*.

71. In September of 2023, Pierce announced that its authorized dealer, Firematic Supply Co., Inc. acquired Churchville Fire Equipment. The acquisition consolidated Firematic's territory exclusivity to include Connecticut and the entirety of New York. Prior to the acquisition, Churchville Fire Equipment had been a fixture in the industry for 70 years and had been entirely employee-owned for the last 19 of those years.[95]

72. In December 2024, Pierce announced that its authorized dealer, Reliant Fire Apparatus, Inc. had expanded its exclusive territory. Prior to the announcement, Reliant had territory exclusivity for southern Wisconsin and Iowa; the expansion increased this territory to include the rest of Wisconsin.[96] Pierce did not state which dealership had been servicing this territory previously. Seven months later, in June 2025, Pierce announced that Reliant had acquired Halt Fire, Inc., the authorized Pierce dealership for the state of Michigan. This acquisition gave Reliant territory exclusivity over Iowa, Michigan, and Wisconsin.[97]

---

[94] *Pierce Dealer, Siddons-Martin Emergency Groups, Broadens Territory with Acquisition of Emergency Vehicle Specialists*, Pierce Mfg., Inc. (Apr. 6, 2023), https://web.archive.org/web/20260604162800/https://www.piercemfg.com/pierce/press-release/pierce-dealer-siddons-martin-emergency-group-broadens-territory-with-acquisition-of-emergency-vehicle-specialists.

[95] *Pierce Dealer Firematic Supply Co. Grows Presence in Northeast with Acquisition of Churchville Fire Equipment*, Pierce Mfg., Inc. (Sept. 1, 2023), https://web.archive.org/web/20260604163109/https://www.piercemfg.com/pierce/press-release/pierce-dealer-firematic-supply-co.-grows-presence-in-northeast-with-acquisition-of-churchville-fire-equipment.

[96] *Reliant Fire Apparatus Expands Pierce Dealership Territory to Serve All of Wisconsin and Iowa*, Pierce Mfg., Inc. (Dec. 4, 2024), https://web.archive.org/web/20260604163247/https://www.piercemfg.com/pierce/press-release/reliant-fire-apparatus-expands-pierce-dealership-territory-to-serve-all-of-wisconsin-and-iowa.

[97] *Reliant Fire Apparatus Acquires Halt Fire, Inc. Expands Pierce Dealership Territory to Include the State of Michigan*, Pierce Mfg., Inc. (June 12, 2025), https://web.archive.org/web/20260604163428/https://www.piercemfg.com/pierce/press-release/reliant-fire-apparatus-acquires-halt-fire-inc.-expands-pierce-dealership-territory-to-include-the-state-of-michigan.

26

### iii.     *Rosenbauer*

73.     Rosenbauer International AG is an international conglomerate headquartered in Leonding, Austria.  Internationally, Rosenbauer International AG claims to be the largest provider of firefighting technology in the world.[98]

74.     Rosenbauer International's initial entry into the US market predated the wave of consolidation the market has faced in the past decade, but followed the same strategy nevertheless.

75.     In 1995, Rosenbauer International AG created Rosenbauer Minnesota LLC as a joint venture with General Safety Equipment Corp. ("General Safety").  Founded in Lindstrom, Minnesota in 1929, General Safety operated as a family business, making high-quality, customized firefighting equipment.[99]  The company moved to Wyoming, Minnesota in 1992 under the leadership of Kevin Kirvida, the grandson-in-law of the company's founder.  General Safety entered a 50-50 ownership structure of the new entity with Rosenbauer International.[100]

76.     In 1998, Rosenbauer International created Rosenbauer South Dakota LLC as a merger with Central States Fire Apparatus ("Central States").  Initially founded by Harold and Helen Boer as Lyons Garage in Lyons, South Dakota in the 1970s, the company quickly grew into Central States, manufacturing fire engines and developing a national dealer network.  In merging with Central States, Rosenbauer International formed Rosenbauer America LLC and brought

---

[98] *Rosenbauer*, Austrian Embassy Washington, https://web.archive.org/web/20260604163723/https://www.austria.org/business/rosenbauer (last visited June 10, 2026).

[99] *Rosenbauer America*, Rosenbauer Int'l AG, https://web.archive.org/web/20260604163950/https://www.rosenbauer.com/en/contact/locations/america (last visited June 10, 2026).

[100] *Progress Edition: New division fires up Rosenbauer*, Forest Lake Times (Apr. 9, 2014), https://web.archive.org/web/20260604164437/https://www.hometownsource.com/forest_lake_times/news/local/progress-edition-new-division-fires-up-rosenbauer/article_c1109e0a-c689-53e1-8084-9960c66740d9.html.

Rosenbauer Minnesota LLC and the newly formed Rosenbauer South Dakota into the fold of the new American parent company.[101]

77. In 2000, Rosenbauer International created Rosenbauer Aerials LLC through a merger with RK Aerials. Founded in 1988 in Fremont, Nebraska by Rob and Pam Kreikemeier, RK Aerials specialized in manufacturing aerial ladders and work platforms for fire trucks. Similar to Rosenbauer Minnesota LLC and Rosenbauer South Dakota LLC, Rosenbauer Aerials LLC was brought under Rosenbauer America.[102]

78. While Rosenbauer America served to consolidate several Midwest fire truck manufacturers in a matter of years, the company maintained some level of its traditional operation for a period of time. Kevin Kirvida, the grandson of the founder of General Safety Equipment, third-generation owner of the company, and the official responsible for the partnership with Rosenbauer International, remained as president of the newly formed Rosenbauer Minnesota LLC.[103] Likewise, Harold Boer of Central States Fire Apparatus remained with the newly formed company, serving as President of Rosenbauer America until 2019.[104]

79. Concurrent with the changes in other parts of the market, both Kirvida and Boer withdrew from operating activities within the company in 2019.[105] The advisory board for

---

[101] *Rosenbauer America*, Rosenbauer Int'l AG, https://web.archive.org/web/20260604163950/https://www.rosenbauer.com/en/contact/locations/america (last visited June 10, 2026).
[102] *Id.*
[103] *Minnesota Company Delivers Fire Apparatus Around the World*, Fire Apparatus & Emergency Equip. Mag. (Nov. 26, 2014), https://web.archive.org/web/20260604165809/https://www.fireapparatusmagazine.com/fire-apparatus/minnesota-company-delivers-fire-apparatus-around-the-world/.
[104] *Rosenbauer America Group Announces Retirement of Harold Boer, Appointment of John Slawson*, Firefighter Nation (Oct. 18, 2019), https://web.archive.org/web/20260604170157/https://www.firefighternation.com/firerescue/rosenbauer-america-group-announces-retirement-of-harold-boer-appointment-of-john-slawson/.
[105] *Annual Report 2019, Foreword from the CEO*, Rosenbauer Int'l AG, https://web.archive.org/web/20220303025810/https://bericht.rosenbauer.com/2019/en/geschaftsbericht/foreword-from-the-ceo/ (last visited June 10, 2026).

Rosenbauer America LLC announced that it had appointed John Slawson as the new chairman and CEO of the company.

80.     Following REV's series of acquisitions, Rosenbauer International AG sought to consolidate its control over its American holding group.  In April 2022, Rosenbauer International increased its stake in Rosenbauer America by buying the 25 percent minority stake of an unnamed LLC member, increasing its share to 75 percent.[106]  Two months later, Rosenbauer International solidified its control by purchasing the remaining 25 percent minority stake in Rosenbauer America from General Safety Equipment Corp., thus taking ownership of Rosenbauer America in full.[107]

81.     In a statement of corporate strategy, Rosenbauer stated that "acquisition of minority interests in local [Rosenbauer] companies in 2022 created the conditions for leveraging synergies and making the best possible use of future market opportunities."[108]  The full acquisition and control of Rosenbauer America marked a substantial transition for Rosenbauer's operations in the United States: The conveyance of the minority stake occurred within three years of the departure

[106] *Rosenbauer International increases stakes in Rosenbauer America*, Rosenbauer Int'l AG (Apr. 29, 2022), https://web.archive.org/web/20251214214901/https://www.rosenbauer.com/en/company/investor-relations/financial-news/2022/04/rosenbauer-international-increases-stakes-in-rosenbauer-america.
[107] *Rosenbauer International fully acquires Rosenbauer America*, Rosenbauer Int'l AG (June 23, 2022), https://web.archive.org/web/20251214215110/https://www.rosenbauer.com/en/company/investor-relations/financial-news/2022/06/rosenbauer-international-fully-acquires-rosenbauer-america.
[108] *Reporting 2024, Our Company*, Rosenbauer Int'l AG, https://web.archive.org/web/20260604170848/https://bericht.rosenbauer.com/2024/en/annual-report/our-company/ (last visited June 10, 2026).

of Kevin Kirvida and Harold Boer from daily operations of the company.[109]  Within two months of this transition, Rob Kreikemeier, had left daily operations of the company as well.[110]

82.    Similar to Oshkosh, Rosenbauer dealers are assigned non-overlapping territories, reducing inter-dealer competition.



***Fig. 6:  Geographic Territories of Rosenbauer Dealers***[111]

## C.    Manufacturer Defendants Seek to Cooperate Rather than Compete

83.    Beyond their acquisitions of independent manufacturers and consolidating affiliated dealerships to tamp down competition, the Manufacturer Defendants have sought to

[109] *Annual Report 2019, Foreword from the CEO*, Rosenbauer Int'l AG, https://web.archive.org/web/20220303025810/https://bericht.rosenbauer.com/2019/en/geschaftsbericht/foreword-from-the-ceo/ (last visited June 10, 2026).
[110] *Rosenbauer America Announces New Executive Leadership Team*, Rosenbauer Int'l AG (Aug. 11, 2022), https://web.archive.org/web/20260604171128/https://www.firefighternation.com/firerescue/rosenbauer-america-announces-new-executive-leadership-team/.
[111] *Contact*, Rosenbauer Int'l AG, https://web.archive.org/web/20251101123631/https://www.rosenbauer.com/en-us/contact/contact-partners (last visited June 10, 2026).

cooperate with one another rather than vigorously compete, a choice made substantially easier by increased concentration within the market.

84. In July 2020, Mike Virnig, Vice President of Sales for REV's Fire Group, was quoted as saying, "What I won't tolerate is negative selling. I won't tolerate it with our competitors, and I won't tolerate it within the group. If I even get a hint or see anything like a dealer taking a shot at another dealer, we step in and say 'Stop it.'"[112]

85. In April 2025, the New York Times reported that REV executives had told analysts that they would substantially raise profit margins and that they expected other companies were doing the same.[113] Then two months later in its Investor Day presentation, Oshkosh indicated that its adjusted operating margin increased from 4.8% in 2022 to 10.5% in 2024, with a projected operating margin of 12-14% by 2028.[114]

86. In December 2022, Fire Apparatus Magazine, reporting on the state of the industry going into 2023, conducted an interview with Jerry Halpin, industry insider and co-owner and Vice President of Sales and marketing for C.E.T. Fire Pumps. The magazine reported, "Halpin says people in the fire service industry are talking amongst themselves, looking for competitive edges to bolster opportunities through partnerships and other alliances" and that "there will be cooperation between like businesses to gain an edge in the marketplace."[115]

---

[112] *REV Group Invests in the Strength of Fire Apparatus Brands*, Fire Apparatus & Emergency Equip. Mag. (July 1, 2020), https://web.archive.org/web/20260604152020/https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/.

[113] Mike Baker et al., *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. Times (Feb. 17, 2025) https://www.nytimes.com/2025/02/17/us/fire-engines-shortage-private-equity.html?unlocked_article_code=1.nlA.3QJN._PHFoy37zZ28&smid=url-share.

[114] *Investor Day,* Oshkosh Corp. 83, 86 (June 5, 2026), https://online.flippingbook.com/view/29819025/.

[115] *2022 Was Good for Fire Service Industry; 2023 is Uncertain*, Fire Apparatus & Emergency Equip. Mag. (Dec. 20, 2022), https://web.archive.org/web/20260604161956/https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain/.

**D. FAMA Enables the Manufacturer Defendants' Cooperation**

87. Terex subsidiaries E-One, Ferrara, KME, and Spartan; Oshkosh subsidiaries Pierce, BME, and Maximetal; and Rosenbauer are all members of FAMA.[116] FAMA colludes with the Manufacturer Defendants to enable an information exchange through statistical reports and by organizing twice-yearly in-person meetings.

### i. FAMA Data & Research Committee Reports and Anticompetitive Information Sharing

88. FAMA maintains the Data & Research Committee (the "Committee"), dedicated to enabling an exchange of data between member entities. The Vice-Chair of the Committee is John Schultz, Vice President and General Manager of Pumper Products for Oshkosh's Pierce Manufacturing.[117] Additionally, various executives of other Manufacturer Defendants have, at various times, served on the Committee as well, including Jerry Conley of Pierce, Philip Gerace of Terex subsidiary E-ONE, Inc.,[118] and Drew Kirvida of Rosenbauer America.[119]

89. The Committee aims to "collect and distribute data regarding apparatus sales and orders on a quarterly basis" and to "gather data from various sources that is helpful in business planning by member companies." To effectuate this, the Committee maintains a digital data portal through which member manufacturers enter "order and delivery statistics on fire apparatus," including data on "past transactions or activities." The data is then forwarded to an accounting

---

[116] *Members List*, Fire Apparatus Mfrs. Ass'n, https://web.archive.org/web/20250917091105/https://www.fama.org/members/list/ (last visited June 10, 2026).
[117] *Data & Research Committee*, Fire Apparatus Mfrs. Ass'n, https://web.archive.org/web/20260604172245/https://www.fama.org/data-research-committee/ (last visited June 10, 2026); *John Schultz*, Pierce Mfg, Inc., https://web.archive.org/web/20251110153742/https://www.piercemfg.com/hubfs/FDIC%202025/Bios/Bio/John%20 Schultz%20-%20Pierce%20Manufacturing.pdf (last visited June 10, 2026).
[118] *2024 Fall Meeting*, Fire Apparatus Mfrs. Ass'n 93, https://web.archive.org/web/20251214213246/https://www.fama.org/wp-content/uploads/2024/10/1729193357_6711658d70ec4.pdf (last visited June 10, 2026).
[119] *2022 Spring Meeting*, Fire Apparatus Mfrs. Ass'n 32, https://web.archive.org/web/20251214210914/https://www.fama.org/wp-content/uploads/2022/03/1646772045_6227bf4d537dc.pdf (last visited June 10, 2026).

firm which compiles the data and returns it to the Committee. The Committee then publishes the data on the members-only portion of the FAMA website.[120]

90. The Committee describes its mission as "providing actionable data for strategic business planning."[121] A former past president of FAMA describes access to competitors' data as "one of the most valuable reasons" for companies to join the organization.[122] FAMA states that these statistical reports are "[a]mong the most powerful benefits of FAMA membership" and members "find this research invaluable for their internal business purposes."[123]

91. FAMA does not release this information to the public. "Only those companies that participate in the statistical studies and members are privy to these reports."[124]

92. However, membership in FAMA is unavailable to municipalities, fire departments, or any other buyers of fire trucks. To be eligible to join FAMA, an entity must be (a) "engaged in the manufacture of fire fighting or fire protection apparatus, including rescue vehicles that could complement said apparatus," or (b) "manufacture components or products which are incorporated by the manufacturer as a permanent part of the completed fire apparatus, or products specifically designed for fire service applications . . . such as chassis, fire pumps, fire hoses, hose reels, ladders, aerial devices, apparatus valves and other water control appliances[…]."[125] Accordingly, the buyers of fire trucks are denied access to this data while manufacturers freely exchange it among themselves.

---

[120] *Data & Research Committee*, Fire Apparatus Mfrs. Ass'n,
https://web.archive.org/web/20251117125649/https://www.fama.org/data-research-committee/ (last visited June 10, 2026).
[121] *Id.*
[122] *The Fire Apparatus Market is Coming Back… Just Look at the Data*, Fire Apparatus Mfrs. Ass'n (Dec. 4, 2015),
https://web.archive.org/web/20260604150729/https://www.fama.org/forum_articles/the-fire-apparatus-market-is-coming-backjust-look-at-the-data/.
[123] *Why Join*, Fire Apparatus Mfrs. Ass'n,
https://web.archive.org/web/20251118005028/https://www.fama.org/why-join/ (last visited June 10, 2026).
[124] *Id.*
[125] *Id.*

93.     Beyond just basic membership requirements, FAMA further restricts access to its data, conditioning access for members upon the sharing of that member's own data with the Committee.  The Committee states that statistical reports may be denied to any company "that was given the opportunity to participate in the program but refused."  Further, statistical reports "[m]ay be denied any company or individual that does not agree in advance of participation to keep the results confidential."[126]

94.     Put another way, member entities agree to share their competitively sensitive, nonpublic information with the knowledge and expectation that their direct competitors will do the same for the collective benefit of all member entities.

95.     FAMA enforced this expectation by ensuring that members must provide their data in order to obtain shared data.

96.     The content and analysis of these statistical reports, as well as the underlying data, are topics of presentations and conversations at members-only FAMA meetings.[127]

### ii.     FAMA Meetings

97.     In addition to creating and disseminating the statistical reports, FAMA organizes semiannual meetings in the spring and fall to "allow for group formulation of organizational goals and provide a forum to share information."[128]

98.     During these meetings, the Manufacturer Defendants and other FAMA members observe presentations and reports on the statistical data collected, including original equipment

---

[126] *Data & Research Committee*, Fire Apparatus Mfrs. Ass'n
https://web.archive.org/web/20251214203957/https://www.fama.org/statistics/ (last visited June 10, 2026).
[127] *Meeting Minutes Fire Apparatus Manfacturers' Association Virual* [sic] *Fall Membership Business Meeting Zoom Webinar*, Fire Apparatus Mfrs. Ass'n 3 (Nov. 9, 2021),
https://web.archive.org/web/20251214203956/https://www.fama.org/wp-content/uploads/2023/02/1677348164_63fa4d44aa528.pdf.
[128] *Why Join*, Fire Apparatus Mfrs. Ass'n,
https://web.archive.org/web/20251118005028/https://www.fama.org/why-join/ (last visited June 10, 2026).

manufacturer market share, market trends, industry backlogs, and sales forecasting, as well as results of FAMA's "Industry and Member Outlook" surveys.

99.     As one FAMA member reported after attending the Spring 2023 FAMA meeting, "I'll tell you, all of the talk down there was about industry statistics.  And, while I can't share those details with you unless you're a FAMA member, what I can tell you is last year in 2022, there were over 6,000 new fire apparatus sold here in the United States."[129]

100.    In a message to FAMA members encouraging them to attend the spring and fall meetings, 2023 FAMA President and former REV executive Bert McCutcheon stated that the meetings "give[] you unprecedented access to your peers[…]."[130]

101.    Meeting attendees also engage in "purchasing roundtables" and FAMA members-only meetings and discussion groups.

102.    The semiannual meetings provide Manufacturer Defendants ample time and opportunity to exchange sensitive economic information and coordinate supply restrictions and prices.  Programming at the meetings dedicates multiple hours each day to social and networking events.[131]

103.    Manufacturer Defendants regularly send their executives to these meetings.  For example, at the Spring 2024 meeting, representatives of BME, E-ONE, Ferrara, KME, Pierce, Rosenbauer, and Spartan were all in attendance.[132]

---

[129] *Inside Darley April 2023*, W.S. Darley & Co. (Mar. 31, 2023),
https://web.archive.org/web/20260604173608/https://www.darley.com/media/inside-darley-april-2023/.
[130] *Newsletter, Winter 2023*, Fire Apparatus Mfrs. Ass'n 2,
https://web.archive.org/web/20251214202136/https://www.fama.org/wp-content/uploads/2023/03/1678795771_641063fb08e61.pdf (last visited June 10, 2026).
[131] *2025 FAMA Spring Meeting Event Schedule*, Fire Apparatus Mfrs. Ass'n
https://web.archive.org/web/20250327162747/https://www.fama.org/wp-content/uploads/2025/02/2025-2-13-2025-Overall-Event-Schedule.pdf (last visited June 10, 2026).
[132] *2024 FAMA Spring Meeting Registered Attendee List as of 2/17/2024*, Fire Apparatus Mfrs. Ass'n (Feb. 17, 2024) https://web.archive.org/web/20251214223439/https://www.fama.org/wp-content/uploads/2024/02/2024-2-17-Reg-Report.pdf.

104.   In addition to the statistical reports and in-person meetings, FAMA "communicates with its members on a regular basis via emails, its website and an extensive FAMA newsletter."[133] These communications provided Manufacturer Defendants yet another opportunity and means by which to coordinate.

**E.   The Manufacturer Defendants Restricted Output and Raised Prices in the Market**

*i.      Fire Truck Backlogs Grew*

105.   After the economy substantially recovered from the Great Recession, fire truck orders steadily increased from the mid-2010s until 2020.  Following the pandemic, with federal COVID-19 relief funds flowing to state and municipal governments, new fire truck orders grew approximately 50% from 2020 to 2022, reaching roughly 6,000 for the first time since 2008.  Since then, annual order activity has remained between 5,500 and 6,500. [134]

106.   Manufacturer Defendants' production has not kept pace with this increased demand.  Rather, their backlogs have skyrocketed, with no signs of coming down.

107.    At the close of the company's fiscal year on October 31, 2022, REV reported a $3.12 billion backlog for its Specialty Vehicles segment, which contains its fire truck manufacturing line of business, among others.[135]  That number jumped to a $4.08 billion backlog

[133] *Why Join FAMA?*, Fire Apparatus Mfrs. Ass'n, https://web.archive.org/web/20251222185432/https://www.fama.org/wp-content/uploads/2019/01/10-Reasons-to-Join-FAMA-11-6-18.pdf (last visited June 10, 2026).

[134] Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*, BIG by Matt Stoller (Jan. 25, 2025), https://web.archive.org/web/20260604052955/https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll.

[135] *Annual Report* (Form 10-K), REV Group, Inc. 41 (Dec. 13, 2023), https://web.archive.org/web/20251009111144/https://www.sec.gov/Archives/edgar/data/1687221/000095017023069876/revg-20231031.htm. In its annual Form 10-K submission to the Securities and Exchange Commission, REV reports its backlogs by the segment of the company carrying that backlog.  The REV segment that contains its fire truck line of business is its "Specialty Vehicles" segment.  This segment contains fire trucks, ambulances, and commercial infrastructure vehicles.  Prior to 2024, fire and emergency vehicles were reported separately from commercial infrastructure vehicles.  For the sake of consistent analysis of its backlog, the backlogs for 2022 and 2023 contain both fire and emergency vehicles as well as commercial infrastructure vehicles.

in 2023.  The reported backlog has only continued to increase, rising to $4.18 billion in 2024 and $4.4 billion in 2025.[136]

108.  Oshkosh has reported similar unprecedented increases in its backlog.  Oshkosh's Vocational segment, which contains its fire truck manufacturing line of business, among others, reported a $3.5 billion backlog as of December 31, 2022.[137]  That backlog saw a staggering 89% increase to $6.63 billion by the end of the first quarter of 2026.[138]

109.  Because Rosenbauer America is not a publicly traded company, insight into the firm's backlog is less transparent than that of REV or Pierce.  However, Rosenbauer International reported an order backlog of $2.567 Billion as of December 31, 2024.[139]

110.  Increased backlogs have resulted in substantial delays between a municipality like the City of Providence ordering a fire truck and a Manufacturer Defendant delivering it.  Wait times in some areas have more than quadrupled, rising from a one-year lead time to over four years in some instances.  Both the Seattle, WA and Evanston, IL fire departments have reported four- to four-and-a-half-year wait times.[140] As described above, the City of Providence is still waiting on equipment it ordered in 2024.

---

[136] *Annual Report* (Form 10-K), REV Group, Inc. 41 (Dec. 10, 2025), https://web.archive.org/web/20260604155854/https://www.sec.gov/Archives/edgar/data/1687221/00011931252531 3470/revg-20251031.htm.

[137] *Annual Report* (Form 10-K), Oshkosh Corp. 41 (Feb. 29, 2024), https://web.archive.org/web/20250221154431/https://www.sec.gov/Archives/edgar/data/775158/000095017024022 841/osk-20231231.htm.

[138] *Quarterly Report* (Form 10-Q), Oshkosh Corp. 32 (May 8, 2026), https://web.archive.org/web/20260605150751/https://www.sec.gov/Archives/edgar/data/775158/000119312526214 298/osk-20260331.htm.

[139] *Rosenbauer Group FY 2024 Financial Figures*, Rosenbauer International AG 4 (Apr. 11, 2025), https://web.archive.org/web/20260610011849/https://www.rosenbauer.com/Sharepoint/CorporateCommunications/ Documents/Presentations/2024/2024%20Investors%20Presentation%20FY.pdf (reporting a backlog of €2.28 billion, or $2.567 billion based on the exchange rate at the time of the investor presentation).

[140] *Firetruck Fleet Aging Faster Than Seattle Can Make Repairs*, Gov't Tech. (Apr. 2, 2024), https://web.archive.org/web/20260604170619/https://www.govtech.com/em/disaster/firetruck-fleet-aging-faster-than-seattle-can-make-repairs; *Council OK's fire truck buy*, Evanston Now (Mar. 26, 2024), https://web.archive.org/web/20260611150527/https://evanstonnow.com/council-oks-fire-truck-buy/.

37

111.    In 2022, orders for new trucks spiked to 45% above the 2011-2019 average. Concurrently, order fulfillment dropped nearly 10% below the average across the same time period.[141]



*Fig. 7:  North America Fire Apparatus Trend*[142]

112.    While the total number of fulfillments has trended upward, it has not been enough to cover the demand and reduce the backlog.

113.    In addition to complete fire truck deliveries, replacement part orders have also seen substantial delays.[143]

---

[141] *FAMA Releases Fire Apparatus Industry Update*, Fire Eng'g (May 30, 2025), https://web.archive.org/web/20260604170152/https://www.fireengineering.com/fire-apparatus/fama-releases-fire-apparatus-industry-update/.
[142] *Id.*
[143] *Testimony of Basel J. Musharbash*, U.S. Senate Comm. on Homeland Sec. and Gov't Affairs Subcomm. On Disaster Mgmt., Dist. Of Columbia, and Census 6 (Sept. 10, 2025) https://web.archive.org/web/20260604215113/https://www.hsgac.senate.gov/wp-content/uploads/Musharbash-Testimony.pdf.

114. Supply chain disruptions in the wake of the COVID-19 pandemic or other geopolitical events of the early 2020s do not explain these delays. While supply chains to the United States were disrupted as a function of the pandemic in 2021 and 2022, the Federal Reserve Bank of New York's Global Supply Chain Pressure Index returned to below its baseline level by February 2023. As of May 2023, the index had hit an all-time low, indicating low pressure on supply chains.



*Fig. 8: Global Supply Chain Pressure Index, Federal Reserve Bank of New York*[144]

### ii. Manufacturer Defendants Have Maintained Low Output

115. In a well-functioning, competitive market, a significant surge in demand—such as that seen by the fire truck market coming out of the pandemic—would be met with manufacturers expanding their production capacity to capture the demand and compete for sales. However, the Manufacturer Defendants have not increased their production capacity.

---

[144] *Global Supply Chain Pressure Index*, Fed. Rsrv. Bank of N.Y., https://web.archive.org/web/20260604165425/https://www.newyorkfed.org/research/policy/gscpi#/interactive (database updated May 2026).

116. REV was reported to spend a small portion of its revenue—only about one percent—on upgrading its buildings and equipment, a small amount compared to an average manufacturer.[145]

117. As former REV investor Alexander Yaggy characterized it, "How can you have a $4 billion backlog and not spend any money to support it. It's reflective of an uncompetitive market."[146]

118. Neither Oshkosh nor Rosenbauer have attempted to meet this surge in demand or capture market share by expanding their production capacity.

119. Further, Manufacturer Defendants have actively shuttered existing plants. In September 2021, right as the industry was beginning to experience the swell in demand, REV announced that it would be closing down two KME custom fire truck manufacturing facilities in Pennsylvania and Virginia in April of 2022.[147] These closures reduced the company's manufacturing footprint by roughly one third.[148]

120. REV stated via press release that the orders in progress at the two shuttering KME facilities would be completed by other REV manufacturing plants.[149] The foreseeable result—that the manufacturing process would incur additional delays—came to fruition. Orders that would have been completed by the KME facility had to be completed in a piecemeal fashion through

---

[145] Mike Baker et al., *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. Times (Feb. 17, 2025) https://www.nytimes.com/2025/02/17/us/fire-engines-shortage-private-equity.html?unlocked_article_code=1.nlA.3QJN._PHFoy37zZ28&smid=url-share.
[146] *Id.*
[147] *Id.*
[148] *Id.*
[149] *REV Group Announces Plans to Shift KME Production to Other REV Fire Group Facilities*, Fire Apparatus & Emergency Equip. Mag. (Sept. 10, 2021), https://web.archive.org/web/20260604164006/https://www.fireapparatusmagazine.com/fire-apparatus/rev-group-announces-plans-to-shift-kme-production-to-other-rev-fire-group-facilities/.

40

multiple manufacturing sites. One municipality received its truck more than four years after first placing the order.[150]

121. Despite the backlogs, the Manufacturer Defendants' behavior does not indicate any concern that their customers might cancel their orders or that a competitor might encroach on their market share.

122. On a 2023 conference call, REV Chief Executive Officer Mark Skonieczny stated that he did not expect the delays to cause cancellations because once a city sets aside the money, it is earmarked and REV gets a deposit. "That money is allocated to those units, so we feel good about that."[151]

123. In fact, the Manufacturer Defendants view the long backlog as a strategic advantage. According to REV's SEC filing, "[C]ertain of our businesses carry a relatively long-duration backlog which enables strong visibility into future net sales. Where this backlog visibility exists, we are able to more effectively plan and predict our sales and production activity."[152]

### iii. Prices for Fire Trucks Have Doubled in the Last Decade

124. Given the surge in demand for fire trucks and a manufacturing capacity that is either steady or decreasing, the cost for fire trucks has approximately doubled in the last decade.[153]

---

[150] Mike Baker et al., *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. Times (Feb. 17, 2025) https://www.nytimes.com/2025/02/17/us/fire-engines-shortage-private-equity.html?unlocked_article_code=1.nlA.3QJN._PHFoy37zZ28&smid=url-share.
[151] *Id.*
[152] *Annual Report* (Form 10-K), REV Group, Inc. 11 (Dec. 10, 2025), https://web.archive.org/web/20260605224119/https://www.sec.gov/Archives/edgar/data/1687221/000119312525313470/revg-20251031.htm.
[153] *Letter to Attorney General Pam Bondi, Assistant Attorney General Gail Slater, and Federal Trade Commission Chair Andrew Ferguson*, Am. Econ. Liberties Project 2 (May 13, 2025), https://web.archive.org/web/20260506103208/https://www.economicliberties.us/wp-content/uploads/2025/05/FINAL-2025-5-13-Letter-to-FTC-and-DOJ-re-Firetrucks.pdf.

41

125.  In the mid-2010s, a standard pumper truck cost between $300,000 and $500,000. Today, a pumper costs approximately $1 million.  Similarly, a ladder truck that cost between $750,000 and $900,000 in the 2010s, today, costs approximately $2 million.[154]

126.  Because of the drastic increase in concentration within the industry, fire departments find they have little recourse when receiving high bids.  As one industry executive noted, "Manufacturers, distributors, and other emergency service-related industries were all impacted by this trend [of mergers and acquisitions].  As these activities continue, consumer choice will be degraded.  There are now times when all vendors at a bid table, each with a 'different' product are all owned and managed by the same parent company.  How is that competitive for the purchaser?"[155]

### iv.  *Manufacturer Defendants Use "Floating Prices" to Charge Higher Prices*

127.  Beyond the public safety risk that a delayed fire truck delivery may cause a municipality, there is financial risk as well.

128.  The Manufacturer Defendants have used the backlogs that they created to justify imposing "floating" price clauses on their customers.  Using the purported difficulty of projecting material costs over a years-long lead time as an excuse, the Manufacturer Defendants have added price clauses to their contracts that allow them to increase the final price of a truck after it has gone into production.  Due to production delays (which have been caused by the Manufacturer

---

[154] Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*, BIG by Matt Stoller (Jan. 25, 2025), https://web.archive.org/web/20260604052955/https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll.
[155] *Continued Growth and Mergers and Acquisitions Activity Expected for 2017*, Fire Apparatus & Emergency Equip. Mag. (Dec. 6, 2016), https://web.archive.org/web/20260604163010/https://www.fireapparatusmagazine.com/fire-apparatus/continued-growth-and-mergers-and-acquisitions-activity-expected-for-2017/.

Defendants themselves), this means that Manufacturer Defendants can then impose "surcharges" on the customer years after a fire department initially orders a truck.[156]

129. Mark Fusco of Rosenbauer America has conceded that these surcharges are used but claims that some price hikes are beyond the manufacturer's control.[157] However, manufacturers are raising prices beyond what is required to cover the manufacturers' increased costs. In a February 2025 SEC filing, Oshkosh stated that "The increase in gross margin in the Vocational segment was primarily attributable to improved pricing."[158]

## F. Defendants' Conspiracy Had the Intended Effect of Increasing Manufacturers' Profit Margins and Revenues

131. The Manufacturer Defendants consolidation and coordination have had their intended effect: Profit margins for the firms have skyrocketed at the expense of municipalities like the City of Providence.

132. In a July 2021 investor presentation, REV reported that it had garnered a 3% profit margin for Fiscal Year 2020 across all lines of business with an estimated 6% margin for Fiscal Year 2021. It set for itself a target profit margin of 7% across all lines of business and 7-8% in its Fire & Emergency segment for Fiscal Year 2023.[159]

---

[156] *Floating Prices & Lengthy Delivery Times for Fire Apparatus*, Colo. State Fire Chiefs 1 (Aug. 25, 2022), https://web.archive.org/web/20260515003743/https://static1.squarespace.com/static/5ea64a6b9614427b0ff93e6d/t/63080a517f782438bdd6f98e/1661471313934/Floating+Prices+Lenghty+Delivery+Time+for+Fire+Apparatus+Aug+25+2022%5B42%5D.pdf.

[157] *2022 Was Good for Fire Service Industry; 2023 is Uncertain*, Fire Apparatus & Emergency Equip. Mag. (Dec. 20, 2022), https://web.archive.org/web/20260604161956/https://www.fireapparatusmagazine.com/fire-apparatus/2022-was-good-for-fire-service-industry-2023-is-uncertain/.

[158] *Annual Report* (Form 10-K), Oshkosh Corp. 34 (Feb. 20, 2025), https://web.archive.org/web/20260611163124/https://www.sec.gov/Archives/edgar/data/775158/000095017025024305/osk-20241231.htm.

[159] *REV Group, Inc. Presentation*, REV Group, Inc. 16 (July 2021), https://web.archive.org/web/20260308014532/https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf.



*Fig. 9: REV FY2020 Results and FY2023 Targets*[160]

133. While REV did not meet that target by Fiscal Year 2023, reporting a 5.5% profit margin for its Fire & Emergency segment that year,[161] it exceeded the goal by the end of Fiscal Year 2024. In Fiscal Year 2024, REV's profit margins for its Specialty Vehicles segment—combining the Fire & Emergency segment and Commercial Infrastructure Vehicles segment that had previously been reported separately—had jumped to what they described as an "exceptional 8.9 percent."[162]

134. REV has since increased its target profit margins, setting a goal of 14-16% profit margin for its Specialty Vehicles segment by Fiscal Year 2027.

---

[160] *REV Group, Inc. Presentation*, REV Group, Inc. 16 (July 2021), https://web.archive.org/web/20260308014532/https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/rev-group-presentation-july-2021.pdf.

[161] *Annual Report* (Form 10-K), REV Group, Inc. 40 (Dec. 10, 2025), https://web.archive.org/web/20260604155854/https://www.sec.gov/Archives/edgar/data/1687221/000119312525313470/revg-20251031.htm.

[162] Mike Baker et al., *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. Times (Feb. 17, 2025) https://www.nytimes.com/2025/02/17/us/fire-engines-shortage-private-equity.html?unlocked_article_code=1.nlA.3QJN._PHFoy37zZ28&smid=url-share.

44



*Fig. 10: REV FY2027 Targets*[163]

135. With the most recent data, REV is on track to meet this target. In a recent SEC filing, REV reported a 12.5% profit margin for its Specialty Vehicles segment in Fiscal Year 2025.[164] That number continues to trend upward as well: REV reported a 13.9% profit margin for its Specialty Vehicles segment for just the fourth quarter of FY2025, a jump from 11.4% profit margin for the fourth quarter of FY2024.[165]

---

[163] *Investor Presentation*, REV Group, Inc. 9 (Dec. 11, 2024), https://web.archive.org/web/20241215191114/https://investors.revgroup.com/~/media/Files/R/Rev-IR/reports-and-presentations/revg-investor-day-presentation.pdf.
[164] *Annual Report* (Form 10-K), REV Group, Inc. 40 (Dec. 10, 2025), https://web.archive.org/web/20260604155854/https://www.sec.gov/Archives/edgar/data/1687221/000119312525313470/revg-20251031.htm.
[165] *REV Group, Inc. Reports Strong Fiscal 2025 Fourth Quarter and Full Year Results*, REV Group, Inc. (Dec. 10, 2025), https://web.archive.org/web/20251215101241/https://investors.revgroup.com/investor-releases/2025/12-10-2025-120033927.

45

**REV GROUP, INC. AND SUBSIDIARIES**
**SEGMENT INFORMATION**
**(In millions; unaudited)**

| | Three Months Ended October 31, | | Twelve Months Ended October 31, | |
| --- | --- | --- | --- | --- |
| | 2025 | 2024 | 2025 | 2024 |
| Net Sales: | | | | |
| Specialty Vehicles | $ 507.4 | $ 439.9 | $ 1,814.8 | $ 1,726.4 |
| Recreational Vehicles | 157.2 | 158.1 | 649.2 | 654.6 |
| Corporate & Other | (0.2) | (0.1) | (0.5) | (0.8) |
| Total | $ 664.4 | $ 597.9 | $ 2,463.5 | $ 2,380.2 |
| Adjusted EBITDA: | | | | |
| Specialty Vehicles | $ 70.5 | $ 50.2 | $ 226.6 | $ 154.5 |
| Recreational Vehicles | 9.0 | 8.1 | 37.2 | 41.2 |
| Corporate & Other | (9.8) | (8.7) | (34.3) | (32.9) |
| Total | $ 69.7 | $ 49.6 | $ 229.5 | $ 162.8 |
| Adjusted EBITDA Margin: | | | | |
| Specialty Vehicles | 13.9% | 11.4% | 12.5% | 8.9% |
| Recreational Vehicles | 5.7% | 5.1% | 5.7% | 6.3% |
| Total | 10.5% | 8.3% | 9.3% | 6.8% |

| | October 31, 2025 | October 31, 2024 | Increase (Decrease) $ | Increase (Decrease) % |
| --- | --- | --- | --- | --- |
| Period-End Backlog: | | | | |
| Specialty Vehicles | $ 4,402.3 | $ 4,179.8 | $ 222.5 | 5.3% |
| Recreational Vehicles | 232.9 | 291.5 | (58.6) | -20.1% |
| Total Backlog | $ 4,635.2 | $ 4,471.3 | $ 163.9 | 3.7% |

***Fig. 11: REV FY2025 and FY2024 Figures***[166]

136. Oshkosh has seen similar substantial growth in its margins.

137. In a June 2025 investor presentation, Oshkosh reported that its adjusted operating margin had increased from 4.8% in 2022 to 10.5% in 2024, thereby delivering "key 2022 Investor Day targets one year early[.]"[167]

---

[166] *Id.*
[167] *Investor Day*, Oshkosh Corp. 83 (June 5, 2026), https://online.flippingbook.com/view/29819025/.



*Fig. 12: Oshkosh FY2024 Margin Figures*[168]

138. Oshkosh has set a target adjusted operating margin of 12-14% by 2028.[169] It stated that its revenue growth will be "supported by strong backlog," and that its "[m]ulti-year backlog provides strong visibility over horizon."[170]

139. Market-wide, fire truck revenues in the United States, including those of the Manufacturer Defendants, have increased significantly and are projected to continue rising. The U.S. market hit $2 billion in 2023, up slightly from 2022, and is projected to grow to $3 billion by 2029.[171]

[168] *Id.*

[169] *Id. at 86.*

[170] *Id. at 87.*

[171] Timothy Aeppel, *Focus: Fire truck boom highlights divide in US manufacturing*, Reuters (Jan. 19, 2024), https://web.archive.org/web/20240119113752/https://www.reuters.com/markets/us/fire-truck-boom-highlights-divide-us-manufacturing-2024-01-19/.

47

**G.** **Relevant Market, Market Power, and Barriers to Entry**

**i.** ***Relevant Market***

140. The relevant product market to assess the challenged conduct is no broader than all fire trucks, and may be as narrow as custom fire trucks. The relevant geographic market is the United States.

**a.** *Custom Fire Trucks Are a Relevant Product Market.*

141. Fire departments across the country have diverse needs for the fire trucks that they maintain in their fleets. A volunteer fire department in a rural town is unlikely to need a 107-foot aerial ladder, while a populous city is unlikely to need numerous offroad-capable wildfire apparatus. Beyond the differences in types of trucks that fire departments need, they may have further specific needs that require customized fire trucks.

142. The Manufacturer Defendants recognize that custom fire trucks are a distinct, relevant product market for which stock fire trucks—built to standard specifications—are not interchangeable substitutes for the needs of the fire departments that purchase them. For example, Providence requires fire trucks to serve its particular needs for an urban area with heavy traffic and narrow roads, which stock units will not satisfy.

143. Providing written testimony to the U.S. Senate Subcommittee on Disaster Management, District of Columbia, and Census in September of 2025, Dan Meyer, Vice President of Sales for Pierce Manufacturing stated, "Due to the custom nature of the majority of Pierce trucks, customers work closely with dealers to customize their Pierce fire truck and place orders[…]." In contrast, in response to concerns about lead times for fire trucks, Meyer provided, "Understanding the need for faster delivery options, we are also building stock fire trucks, which are built to standard specifications and are available for immediate delivery to fire departments

48

today . . . While we offer these stock-unit trucks and other less-customized apparatuses, the majority of our customers continue to request customized, build-to-order fire trucks."[172]

144. As Mr. Meyer's testimony demonstrates, stock fire trucks at lower expense and shorter wait times are not a reasonable substitute for departments that require custom fire trucks. The firefighters that rely on these trucks agree that stock vehicles are not reasonable alternatives to custom fire trucks.

145. Because stock fire trucks cannot serve as a reasonable substitute, the relevant product market is custom fire trucks. Further, at competitive levels, a small increase in the price of custom fire trucks or a longer delivery time would not cause purchasers of custom fire trucks to switch to stock fire trucks. This is evidently true based on the dramatic increase in prices and delivery times for custom fire trucks, which nevertheless remain overwhelmingly more popular.

b. *Fire Trucks Are the Broadest Possible Relevant Product Market*

146. While municipalities demonstrably prefer custom fire trucks and do not consider stock fire trucks to be a reasonably interchangeable product for their needs, the relevant market is, at the broadest, fire trucks generally.

147. Fire trucks serve the specific need of carrying personnel, water, firefighting and safety equipment, and, in some instances, ladders and other aerial access equipment to the location of any emergency call. Other occupational and specialty vehicles are insufficient for this purpose and are not reasonably interchangeable products.

---

[172] Dan Meyer, *Statement for the Record*, U.S. Senate Comm. on Homeland Sec. and Gov't Affairs Subcomm. On Disaster Mgmt., Dist. Of Columbia, and Census 1, 3 (Sept. 10, 2025), https://web.archive.org/web/20260605002255/https://www.hsgac.senate.gov/wp-content/uploads/Meyer-Testimony.pdf.

148. The National Fire Protection Association ("NFPA") promulgates standards for various emergency services vehicles, aircraft, apparatus, and ambulances.[173] The National Wildfire Coordinating Group ("NWCG") promulgates minimum typing standards for aircraft, crews, and equipment for national mobilization to wildland fire incidents.[174]

149. This case concerns NFPA Standard 1900, Standard for Automotive Fire Apparatus, as well as NWCG Standards for Wildland Fire Resource Typing (collectively, the "Standards"). These Standards classify fire trucks within the United States into seven types, all of which are at issue in this case:[175]

150. Type 1 fire trucks are often referred to as an engine company, engine pumper, or structural firefighting truck. Type 1 fire trucks are the most common type of fire truck in use today. Type 1 fire trucks are designed to support urban, rural, and suburban fire departments because they carry all of the required NFPA firefighting equipment. These trucks support both structural firefighting and initial emergency medical service response. Every Type 1 truck is required to have a pump with a minimum tank size of 300 gallons, must offer a minimum of 1000 gallons per minute of water transfer, and must be equipped at a minimum with 2.5-inch and 1.5-inch-thick hoses of varying lengths. The trucks must also include a full complement of ground ladders, nozzles, forcible entry equipment, rear access and egress, and some level of first aid equipment. They are designed to carry three to four firefighters.

151. Type 2 fire trucks feature many of the same specifications and tools of the Type 1 fire trucks but are less common. They are often used in urban and suburban applications,

---

[173] *NFPA 1900*, Nat'l Fire Prot. Ass'n, https://web.archive.org/web/20251215211028/https://www.nfpa.org/codes-and-standards/nfpa-1900-standard-development/1900 (last visited June 11, 2025).
[174] *NWCG Standards for Wildland Fire Resource Typing, PMS 200*, Nat'l Wildfire Coordinating Grp., https://web.archive.org/web/20260604153626/https://www.nwcg.gov/publications/pms200/nwcg-standards-for-wildland-fire-resource-typing-pms-200 (last visited June 11, 2026).
[175] *Types of Fire Trucks: An Overview and Comparison*, Pierce Mfg. (Nov. 14, 2023), https://web.archive.org/web/20250809142316/https://www.piercemfg.com/pierce/blog/types-of-fire-trucks.

50

performing vehicle accident and rescue responses. Like Type 1 trucks, Type 2 trucks must feature, at minimum, a 300-gallon tank, but the minimum water transfer necessary is only 500 gallons per minute. Type 2 trucks are designed to carry three to four firefighters.

152. Type 3 fire trucks are often referred to as wildland fire trucks or brush trucks. Typically, they are used in rural and wildland settings and are designed to be maneuverable with the ability to manage off-road terrain. The Standards require a Type 3 truck to have a minimum of a 500-gallon water tank and a pump capable of a minimum of 150 gallons per minute. Many Type 3 trucks are equipped with a power-take-off pump, designed so that a vehicle can remain in motion while fighting fire. This enables wildland firefighters to move as necessary when fighting a moving forest fire. Type 3 trucks are designed to carry at least 3 firefighters.

153. Type 4 fire trucks, like Type 3 trucks, are often used in wildland firefighting. However, they carry a larger water tank and have reduced hose capacity requirements. Type 4 trucks must carry two people and a 750-gallon water tank providing 50 gallons per minute of water transfer.

154. Type 5, 6, and 7 fire trucks are often grouped together because they feature many of the same design qualities. These are typically based as pick-up trucks with a 4-wheel drive on a medium-duty chassis. The main difference between the types is the maximum gross vehicle weight rating ("GVWR"). Type 5 trucks have a maximum GVWR of 26,000 lbs; Type 6 trucks have a maximum of 19,500 lbs; and Type 7 trucks have a maximum of 14,000 lbs. These trucks typically carry a 300-gallon water tank and a small booster pump with a minimum water transfer of 50 gallons per minute. They must be equipped to carry two firefighters.



| SPECS | STRUCTURE | | WILDLAND BRUSH TRUCKS | | | | |
|---|---|---|---|---|---|---|---|
| | TYPE 1 | TYPE 2 | TYPE 3 | TYPE 4 | TYPE 5 | TYPE 6 | TYPE 7 |
| TANK MIN. CAPACITY (GAL) | 300 | 300 | 500 | 750 | 400 | 150 | 50 |
| PUMP MIN. FLOW (GPM) | 1000 | 500 | 150 | 50 | 50 | 50 | 10 |
| @ RATED PRESSURE (PSI) | 150 | 150 | 250 | 100 | 100 | 100 | 100 |
| HOSE 2 ½" (MIN. FT) | 1200 | 1000 | ✕ | ✕ | ✕ | ✕ | ✕ |
| HOSE 1 ½" (MIN. FT) | 500 | 500 | 1000 | 300 | 300 | 300 | ✕ |
| HOSE 1" (MIN. FT) | ✕ | ✕ | 500 | 300 | 300 | 300 | 200 |
| LADDERS | ✓ | ✓ | ✕ | ✕ | ✕ | ✕ | ✕ |
| PUMP AND ROLL | ✕ | ✕ | ✓ | ✓ | ✓ | ✓ | ✓ |
| MAX. GVWR (LBS) | ✕ | ✕ | ✕ | ✕ | 26,000 | 19,500 | 14,000 |
| PERSONNEL (MIN.) | 4 | 3 | 3 | 2 | 2 | 2 | 2 |
| TYPICAL USES | STRUCTURAL FIRE RESPONSE | STRUCTURAL FIRE RESPONSE | BRUSH FIRE RESPONSE | BRUSH FIRE RESPONSE | INITIAL ATTACK, BRUSH PATROL | INITIAL ATTACK, BRUSH PATROL | PATROL, MOP UP, INITIAL ATTACK |

✓ REQUIRED    ✕ NOT REQUIRED/OPTIONAL

*Fig. 13: Fire Truck Types and Minimum Specifications*[176]

155.    Additional standards may apply for specially equipped trucks.  For instance, NFPA Chapter 19 describes the requirements for Aerial Fire Apparatus (which include trucks equipped with aerial ladders, elevating platforms or towers, and water tower devices).  Other standards apply to fire trucks deemed Pumper Fire Apparatus, Quint Fire Apparatus, and Mobile Foam Fire Apparatus.

156.    These specialty trucks also fall within the relevant product market.

c.        *The United States Is the Relevant Geographic Market*

---

[176] *Types of Fire Trucks and Their Purpose*, Boise Mobile Equip., Inc. (Feb. 21, 2022), https://web.archive.org/web/20260604153328/https://www.bmefire.com/types-of-fire-trucks/.

157. Each Manufacturer Defendant sells fire trucks to fire departments in all 50 states.

158. The United States is a relevant geographic market and includes all manufacturers who sell fire trucks in the United States.

### ii. *Manufacturer Defendants Enjoy Market Power in the Relevant Markets*

159. REV, Oshkosh/Pierce, and Rosenbauer, as the three dominant manufacturers, enjoy market power in the market for fire trucks in the United States. The Manufacturer Defendants obtained their market power through a series of acquisitions that resulted in the substantially concentrated market seen today.

### a. *Direct Evidence*

160. Direct evidence demonstrates that the Manufacturer Defendants have market power.

161. Here, the proof of actual detrimental effects is not only well documented, but boasted about throughout the pages of Manufacturer Defendants' investor presentations and SEC filings.

162. The Manufacturer Defendants have raised prices dramatically, more than doubling the cost of fire trucks over the last ten years. These increases have not led to a reduction in sales, nor a loss in market share for these dominant firms. Rather, the Manufacturer Defendants have seen their profit margins more than double within just the last three years.

163. Not only have the Manufacturer Defendants successfully raised prices without losing market share, they have also prevented output from increasing to meet the exogenous increase in demand following the recovery from the Covid-19 Pandemic. With such an exogenous increase in demand, preventing the market-wide output from increasing to match is comparably detrimental to outright restricting supply.

53

164. Manufacturer Defendants have admitted that the decision to maintain longer backlogs—rather than increase output to meet increased demand—is a deliberate strategy to garner a strategic advantage in their decision making. Further, the Manufacturer Defendants use this backlog to further extract price increases from their customers.

165. As discussed above, REV has decreased its output capacity. In 2022, REV closed two of the manufacturing sites previously operated by its subsidiary KME. This closure shut down one-third of REV's manufacturing space.

166. The pricing and output decisions of the Manufacturer Defendants constitute "actual detrimental effects" and are direct evidence that the Defendants enjoy market power.

   b.   *Indirect Evidence*

167. Indirect evidence also demonstrates that the Manufacturer Defendants have market power in the relevant markets.

168. Here, the relevant market is no broader than the market for fire trucks in the United States and includes narrower submarkets custom firetruck, custom aerials, and custom pumpers.

169. REV captures approximately $1 billion of annual fire truck sales made in the United States. Oshkosh and Pierce capture approximately $750 million of annual fire truck sales made in the United States. Rosenbauer captures approximately $307 million of annual fire truck sales made in the United States. Consequently, Manufacturer Defendants collectively share approximately 70% to 80% of the market.[177] The defendants have similar shares in custom firetruck markets.

---

[177] Mike Baker et al., *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. Times (Feb. 17, 2025) https://www.nytimes.com/2025/02/17/us/fire-engines-shortage-private-equity.html?unlocked_article_code=1.nlA.3QJN._PHFoy37zZ28&smid=url-share.

170. High barriers to entering the fire truck manufacturing industry exist and protect Manufacturer Defendants' market share.

171. Fire trucks are expensive, made-to-order specialty equipment. End-users can specify nearly every aspect of the apparatus they order, from the size of the motor, to the placement of emergency lights, to the location of equipment storage compartments.

172. This demand for customization stems from the diversity of the customer base. According to U.S. Fire Administration, there are approximately 30,000 fire departments in the United States, ranging from large, urban departments to small, rural departments.[178] There are approximately 52,000 fire stations across the country.[179] Each fire department, and sometimes each fire station, has their own specific needs and requirements of the equipment they use to perform their duties.

173. As Kent Tyler, president of REV's Fire Group put it, "[t]hese are fully custom trucks, and they don't just happen overnight."[180] Put another way, establishing the technical engineering expertise, supply chains, facilities, manufacturing capacity, labor force, and customer base to successfully enter the market is a years-long endeavor.

174. The cost of producing fire trucks, combined with the long lead times, mean that only well-funded, established corporations have a significant chance of sustaining themselves through the initial investment period. Such large capital outlays substantially inhibit entry into the market.

---

[178] *National Fire Department Registry Quick Facts*, U.S. Fire Admin., https://web.archive.org/web/20260604152629/https://apps.usfa.fema.gov/registry/summary (database last updated June 2, 2026).
[179] *Id.*
[180] *REV Group Invests in the Strength of Fire Apparatus Brands*, Fire Apparatus & Emergency Equip. Mag. (July 1, 2020), https://www.fireapparatusmagazine.com/fire-apparatus/ladder-trucks/rev-group-invests-in-the-strength-of-fire-apparatus-brands/.

## H. Defendants Actively Concealed the Conspiracy

175. Plaintiff had neither actual nor constructive knowledge of the facts constituting Defendants' conspiracy. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff on inquiry notice that there was a conspiracy to fix the price of fire trucks. Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff.

176. Defendants concealed their conspiracy by communicating competitively sensitive information to one another through FAMA Statistical Reports that are unavailable to the public. Defendants attended members-only discussions during twice-annual FAMA meetings, providing them with ample opportunity to surreptitiously communicate and prevent the existence of written records. Because the public had no access to either the FAMA reports or the FAMA members-only meetings, there was no reason for Plaintiff to suspect that Defendants were engaged in an unlawful anticompetitive scheme.

177. What's more, Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Prior to investigative articles by Basel Masharbash[181] and journalists with the New York Times,[182] Plaintiff reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Manufacturer Defendants' fire truck prices before these events.

---

[181] Basel Musharbash, *Did a Private Equity Fire Truck Roll-Up Worsen the L.A. Fires?*, BIG by Matt Stoller (Jan. 25, 2025), https://web.archive.org/web/20260604052955/https://www.thebignewsletter.com/p/did-a-private-equity-fire-truck-roll.
[182] Mike Baker et al., *As Wall Street Chases Profits, Fire Departments Have Paid the Price*, N.Y. Times (Feb. 17, 2025) https://www.nytimes.com/2025/02/17/us/fire-engines-shortage-private-equity.html?unlocked_article_code=1.nlA.3QJN._PHFoy37zZ28&smid=url-share.

178.    By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations against Plaintiff's claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Rhode Island Antitrust Act, R.I. Gen. Laws § 6-36-4, has been tolled and suspended.

179.    Further, a continuing violation restarts the statute of limitations period each time Defendants commit an overt act.  Defendants continued to make sales of fire trucks whose prices were fixed, or suppressed, as a result of Defendants' continually renewed and adjusted price-fixing and information exchange agreement.  Defendants needed to continually renew and adjust their information exchange agreement to account for ever-fluctuating economic and market conditions.

180.    Defendants' overt acts were new and independent acts that perpetuated their agreement and kept them current with market conditions.  They were not merely affirmations of Defendants' previous acts.  Thus, each illegally priced sale of a fire truck constitutes a new cause of action for purposes of the statute of limitations.

## I.    Oshkosh and Its Subsidiaries Engage in Exclusive Dealing in the After-Market and Replacement Parts Market

181.    In addition to anticompetitive acquisitions and conduct in the market for fire trucks themselves, Oshkosh and its subsidiaries, particularly Pierce, have restrained competition in the market for after-market and replacement parts for fire trucks.

182.    Pierce sells replacement parts through third-party dealers.  These replacement parts are manufactured to replace original parts on Pierce fire trucks and are not interchangeable with parts that perform different functions or that are manufactured for fire trucks other than Pierce fire trucks.  Pierce manufactures these proprietary parts specifically to fit only on Pierce fire trucks or fire trucks built on Pierce fire truck chassis.

183. Pierce replacement parts include two categories: 1) Pierce original equipment manufacturer parts ("OEM Parts"), which are manufactured by Pierce to the same specifications as original parts on new fire trucks and are incompatible with fire trucks made by other manufacturers; and 2) parts manufactured for Pierce by third-party manufacturers that bear Pierce branding. These latter so-called "White-Label Parts" also bear a Pierce serial number and are sold by Pierce through its third-party dealers. White-Label Parts are compatible with Pierce fire trucks, as well as fire trucks manufactured by other firms.

184. Upon information and belief, these third-party manufacturers may manufacture both Pierce-branded White-Label Parts, as well as parts that bear the brand of the manufacturer. Both Pierce-branded and manufacturer-branded parts are compatible with Pierce fire trucks and other-brand fire trucks.

185. Upon information and belief, Pierce requires its dealers/suppliers to agree to sell only Pierce-branded replacement parts for its fire trucks to customers, and not to sell equivalent parts that are non-Pierce branded. Where a third party-branded part may function appropriately, Pierce dealers are required to refuse to sell that non-Pierce branded part.

186. Upon information and belief, Pierce deliberately manufactures its fire trucks with OEM parts designed to be incompatible with comparable third-party replacement parts so that only Oshkosh-manufactured OEM parts may be purchased and used. Pierce accomplishes this by manufacturing specific, proprietary components with slightly different dimensions than industry standard so that comparable third-party parts are incompatible with Pierce fire trucks.

187. Upon information and belief, Pierce requires its customers to purchase Pierce replacement parts through provisions in product warranties provided to customers as part of the purchase agreement. Customers may void their warranties if they install a non-Pierce branded replacement part without Pierce authorization.

### i. Relevant Market

188. Pierce Replacement Parts Sold in the United States is a relevant antitrust market. Pierce Replacement Parts are a relevant product market because there is no reasonable substitute for Pierce Replacement Parts. Once a municipality has made the investment into purchasing a Pierce fire truck, there is no opportunity to buy parts outside of the Pierce ecosystem. Parts that are made for other fire trucks will not function properly, may void a truck's warranty, and are not reasonable substitutes.

189. Both OEM Parts and White-Label Parts fall within the Pierce Replacement Parts market.

190. The relevant geographic market is no larger than the United States and may be as narrow as the exclusive regional territories that Pierce assigns it authorized dealers.

### ii. Oshkosh, Through Pierce, Has Market Power in the Relevant Market

191. Oshkosh, through its subsidiary Pierce, has market power in the Pierce Replacement Parts market through both direct and indirect evidence.

192. For municipalities that own Pierce fire trucks, when a part in the fire truck breaks, the municipality is limited to the parts that are compatible with and will function in the Pierce fire truck. These replacement parts are distributed and sold only through Pierce-authorized dealers and parts suppliers.

193. Pierce may raise the cost of prices for replacement parts through its network of dealers, and the City of Providence and other municipalities have little to no recourse but to pay the higher prices.

194. Due to the highly specialized nature of fire truck manufacturing, the same barriers to entry that prevent new manufacturers from entering the fire truck market similarly prevent new

entrants to the Pierce Replacement Parts market. This is all the truer with proprietary limitations on potential competitors manufacturing Pierce replacement parts.

**J.      Plaintiff Has Been Harmed by Defendants' Acquisitions and Conduct**

195.      The Manufacturer Defendants' acquisitions and conduct have led to higher prices for fire trucks, in turn garnering Manufacturer Defendants substantially higher profit margins. These increased profit margins have come at the expense of the City of Providence and other municipalities and government entities.

196.      As fire trucks age, they become more prone to frequent and serious breakdowns, thus requiring more costly and frequent maintenance, as well as sustained periods of downtime. The National Fire Protection Association recommends that fire trucks be removed from the frontlines to reserve fleets after 15 years and retired from service after 20 to 25 years. To ensure that it can functionally perform its duties to the city, the Providence Fire Department has been forced to maintain trucks in its reserve fleet that were manufactured in the early 1990s.

197.      Because of significant price increases, municipalities are unable to replace their fleets with the frequency or volume necessary to maintain the same size and age of their fleets. In many cases, fire departments are operating using trucks that have exceeded their service life because buying new trucks is prohibitively expensive. When municipalities are able to order, the manufacturers take years to actually deliver the trucks, causing further delay and risk to public safety.

198.      Aging equipment poses a serious danger to the safety of municipal firefighters and to the public's safety.

199.      Providence currently has 26 fire trucks in its fleet. Of those 26, 16 are engines and 10 are ladder trucks. Providence purchased these trucks from numerous manufacturers, including

Maxim, E-One, Pierce, and Ferrara. Since 2020, Providence has purchased trucks only from Pierce.

200. Providence has purchased numerous fire trucks in the last decade, and these purchases demonstrate the pace with which the Manufacturer Defendants have raised prices.

201. In 2021, Providence purchased three trucks from Allegiance Fire & Rescue, a Pierce dealer in Walpole, Massachusetts. All three trucks were the same model: Pierce Saber 1750 GPM Pumpers. Each truck cost $449,159.

202. In 2024, the City placed an order for an additional five trucks, all the same model: Pierce Saber FR 1750 GPM Hale Pumper Long trucks. Each truck cost $734,320 for a grand total of $3,671,600. In other words, almost identical trucks purchased three years later increased in price by nearly $300,000 each. To add insult to injury, the trucks purchased in 2024 have yet to be delivered—the agreement reflects an August 2027 delivery date.

203. Providence additionally purchased other Pierce trucks in 2020, including multiple aerial ladders. One ladder truck in 2020 cost $1.3 million. In a subsequent round of acquisitions, the same ladder truck cost $2.1 million for the same truck Providence had purchased just a few years earlier.

204. The drastic increase in price between Providence's 2021 and 2024 orders for Pierce fire trucks spans the period of time during which Oshkosh engaged in anticompetitive acquisitions, including its ownership stake in BME and its full acquisition of Maximetal.

205. Plaintiff purchased these trucks from Oshkosh through the Houston-Galveston Area Council Master Price Agreement, a collective purchasing organization. Upon information and belief, U.S. municipalities including the City of Providence could purchase Maximetal vehicles through its U.S. dealers that contracted with HGAC.

61

206. Oshkosh's acquisition of Maximetal reduced competition in the market for fire trucks and thereby raised costs on the City of Providence.

207. Plaintiff has also incurred increased maintenance costs as a function of being unable to purchase as many fire trucks as it would have otherwise in a competitive environment.

## IV. JURISDICTION AND VENUE

208. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 as this action arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Sections 4, 7, and 16 of the Clayton Act (15 U.S.C. §§ 15, 18, 26).

209. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a). Plaintiff's state law claims derive from the same common nucleus of operative fact as their federal claims: Both Plaintiff's federal and state claims concern Defendants' anticompetitive conduct in the market for fire trucks.

210. Venue is appropriate in this District pursuant to 15 U.S.C. § 22, as well as 28 U.S.C. 1391(b)(2). At least one or more of the Defendants have resided or transacted business in this District and is licensed to do business or is doing business in this District. Additionally, the transactions giving rise to Plaintiff's injuries occurred in this District.

211. This Court has personal jurisdiction over Defendants because they: (1) transacted business throughout the United States, including in this District; (2) manufactured, sold, shipped, and/or delivered fire trucks to purchasing entities throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District; and/or (4) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of Plaintiff City of Providence, located in and doing business in this District.

62

212.    Defendants' activities were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

213.    Venue is appropriate in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District. Plaintiff's acquisition of fire apparatus occurred within this District, giving rise to the injury that Plaintiff incurred as a result of Defendants' anticompetitive conduct.

## V.    ANTITRUST INJURY AND DAMAGES

214.    Manufacturer Defendants' acquisitions and anticompetitive conduct have had the following effects, among others:

    a.    Competition in the market for fire trucks has been substantially lessened;

    b.    Price competition for fire trucks has been restrained or eliminated;

    c.    Prices for fire trucks sold by the Manufacturer Defendants and their divisions, subsidiaries, affiliates, or co-conspirators, in turn, have been raised, fixed, maintained, or stabilized at artificially high, noncompetitive levels throughout the United States;

    d.    Purchasers of fire trucks have been deprived of free and open competition; and

    e.    Purchasers of fire trucks have paid artificially inflated, supracompetitive prices.

215.    Manufacturer Defendants' acquisitions have had the ultimate effect of substantially lessening competition, resulting in an increase in the price of fire trucks.

63

216. The ultimate purpose of Manufacturer Defendants' conspiracy is to raise, fix, maintain, or stabilize the price of fire trucks and, as a direct and foreseeable result, Plaintiff has paid supracompetitive prices for fire trucks.

217. By reason of the alleged violations of the antitrust laws, Plaintiff has sustained injury, having paid higher prices for fire trucks than it would have paid in the absence of either a) Manufacturer Defendants' anticompetitive acquisitions, or b) all Defendants' illegal contract, combination, or conspiracy. As a result, Plaintiff has suffered damages.

218. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VI.   LIKELIHOOD OF RECURRENCE

219. Without appropriate relief, Defendants' harmful conduct is likely to recur.

220. Defendants' course of conduct—and the resulting harm to competition and fire truck purchasers—remains ongoing. In addition, there is a reasonable likelihood that Defendants will engage in similar or related conduct in the future.

221. Manufacturer Defendants' conduct has not been isolated; rather, they have engaged in both anticompetitive acquisitions and anticompetitive conduct to execute the consolidation and restraint on competition that has occurred. The numerous acquisitions, price coordination, and anticompetitive information sharing were all performed to stifle competition and enrich the Manufacturer Defendants. This conduct has resulted in egregious increases to fire truck prices and

Manufacturer Defendants' profit margins, all at the expense of public coffers to an amount totaling in the billions.

222.   Defendants have not acknowledged their wrongful conduct, nor have they offered any assurances against engaging in similar conduct in the future.  To the contrary, Defendants seem intent upon maintaining the same pattern that has brought them to this point.[183]

## VII.   CAUSES OF ACTION

### COUNT 1 – AS TO DEFENDANTS OSHKOSH AND PIERCE
**Roll-Up of the Fire Truck Manufacturing Market
in Violation of Section 7 of the Clayton Act
15 U.S.C. § 18**

223.   Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 222 above. All allegations as to the Fire Truck Market apply to the alleged custom markets.

224.   From 2021 to 2022, Oshkosh, directly or indirectly, acquired Maxi-Métal Inc. on June 13, 2022 and an ownership interest in Boise Mobile Equipment on September 16, 2021.

225.   Oshkosh's acquisitions may have substantially lessened competition or tended to create a monopoly in the United States Fire Truck Market in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, whether considered individually or as a series of acquisitions.

226.   The acquisition increased prices and reduced the out of fire trucks. As a direct and proximate result of Defendants' acquisitions, Plaintiff has suffered injury to its property and has been deprived of the benefits of free and fair competition on the merits. Absent the acquisitions, Plaintiff would have paid less for fire trucks and received them sooner.

---

[183] *Terex and Rev Group Announce Strategic Merger, Creating a Leading Specialty Equipment Manufacturer; Terex Announces Plans to Exit Its Aerials Segment*, Terex Corp. (Oct. 30, 2025), https://web.archive.org/web/20260604150552/https://investors.terex.com/news/news-details/2025/TEREX-AND-REV-GROUP-ANNOUNCE-STRATEGIC-MERGER-CREATING-A-LEADING-SPECIALTY-EQUIPMENT-MANUFACTURER-TEREX-ANNOUNCES-PLANS-TO-EXIT-ITS-AERIALS-SEGMENT/default.aspx.

227. Plaintiff seeks three times its damages caused by Defendants' violations of Section 7 of the Clayton Act, the costs of bringing the suit, reasonable attorney fees, and equitable relief, including but not limited to structural relief, as the Court finds necessary to redress and prevent recurrence from Defendants' violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, as alleged herein.

**COUNT 2 – AS TO ALL DEFENDANTS**
**Anticompetitive Information Exchange**
**in Violation of Section 1 of the Sherman Act**
**15 U.S.C. § 1**

228. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 227 above. All allegations as to the Fire Truck Market apply to the alleged custom markets.

229. At least as early as January 1, 2016, and continuing through the present, Defendants have agreed with each other to exchange competitive sensitive information through FAMA. These agreements have unreasonably restrained trade, suppressed competition, and had the actual and likely effect of stabilizing and increasing prices and reducing output in the United States Firetruck Market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

230. In furtherance of this scheme, Defendants and co-conspirators have agreed between and among themselves to exchange competitively sensitive information such as prices, output, supplies, costs, and purchasing and sales strategies.

231. Defendants' information exchange has had anticompetitive effects, including, inter alia: (a) raising, fixing, maintaining, or stabilizing prices of fire trucks at an artificially high level; (b) eliminating or suppressing, to a substantial degree, competition among the Manufacturer Defendants for sales of fire trucks; and (c) reducing the output of firetrucks, delaying delivery times for those firetrucks.

66

232. Each Defendant has participated in one or more overt acts in furtherance of the information exchange.

233. As a direct and proximate result of Defendants' contract, combination, and conspiracy to exchange competitively sensitive information, Plaintiff has suffered injury to its property and has been deprived of the benefits of free and fair competition on the merits. Absent the conspiracy to exchange competitively sensitive information, Plaintiff would have paid less for fire trucks and received its fire trucks sooner.

234. Plaintiff seeks three times its damages caused by Defendants' violations of Section 1 of the Sherman Act, the costs of bringing the suit, reasonable attorney fees, and a permanent injunction enjoining Defendants from ever again entering into similar agreements in violation of Section 1 of the Sherman Act.

<u>**COUNT 3 – AS TO DEFENDANTS OSHKOSH AND PIERCE**</u>
**Exclusive Dealing**
**in Violation of Section 3 of the Clayton Act**
**15 U.S.C. § 14**

235. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 234 above.

236. Pierce has sold and contracted to sell, and fixed the prices charged for Pierce-authorized replacement parts for use in Pierce fire trucks on the agreement and understanding from Pierce-authorized replacement parts dealers that they will not use or deal in replacement parts for Pierce apparatuses of competitors of Pierce in violation of Clayton Act Section 3, 15 U.S.C. § 14. The effect of these agreements may be to substantially lessen competition and has substantially lessened competition.

67

237. Pierce has market power in the relevant market for Pierce Replacement Parts Sold In the United States. As a result of these agreements, the City of Providence has paid supracompetitive prices for replacement parts for its Pierce-manufactured vehicles.

238. As a direct and proximate result of Defendants' these agreements, Plaintiff has suffered injury to its property and has been deprived of the benefits of free and fair competition on the merits. Absent these agreement Plaintiff would have paid less for replacement parts.

239. Plaintiff seeks three times its damages caused by Defendants' violations of Section 3 of the Clayton Act, the costs of bringing the suit, reasonable attorney fees, and a permanent injunction enjoining Defendants from ever again entering into similar agreements in violation of Section 3 of the Clayton Act.

## COUNT 4 – AS TO ALL DEFENDANTS
### Anticompetitive Information Sharing
### in Violation of the Rhode Island Antitrust Act
### R.I. Gen. Laws § 6-36-4

240. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 239 above. All allegations as to the Fire Truck Market apply to the alleged custom markets.

241. At least as early as January 1, 2016, and continuing through the present, Defendants entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for fire trucks in the United

States to supra-competitive levels in violation of Section 4 of the Rhode Island Antitrust Act, R.I. Gen. Laws § 6-36-4.

242. In furtherance of this scheme, Defendants and co-conspirators have agreed between and among themselves to exchange competitively sensitive information such as prices, output, supplies, costs, and purchasing and sales strategies.

243. Defendants' information exchange has had anticompetitive effects, including, inter alia: (a) raising, fixing, maintaining, or stabilizing prices of fire trucks at an artificially high level; (b) eliminating or suppressing, to a substantial degree, competition among the Manufacturer Defendants for sales of fire trucks and (c) reducing the output of firetrucks, delaying delivery times for those firetrucks.

244. Each Defendant has participated in one or more overt acts in furtherance of the information exchange.

245. As a direct and proximate result of Defendants' contract, combination, and conspiracy to exchange competitively sensitive information, Plaintiff has suffered injury to its property and has been deprived of the benefits of free and fair competition on the merits. Absent the conspiracy to exchange competitively sensitive information, Plaintiff would have paid less for fire trucks and received them sooner.

246. Plaintiff seeks three times its damages caused by Defendants' violations of Section 4 of the Rhode Island Antitrust Act, the costs of bringing the suit, reasonable attorney fees, and a

69

permanent injunction enjoining Defendants from ever again entering into similar agreements in violation of Section 4 of the Rhode Island Antitrust Act.

### COUNT 5 – AS TO DEFENDANTS OSHKOSH AND PIERCE
**Exclusive Dealing**
**in Violation of the Rhode Island Antitrust Act**
**R.I. Gen. Laws § 6-36-6**

247. Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 246 above.

248. Pierce has sold and contracted to sell, and fixed the prices charged for Pierce-authorized replacement parts for use in Pierce fire trucks on the agreement and understanding from Pierce-authorized replacement parts dealers that they will not use or deal in replacement for Pierce apparatuses of competitors of Pierce in violation of Section 6 of the Rhode Island Antitrust Act. The effect of these agreements may be to substantially lessen competition and has substantially lessened competition.

249. Pierce has market power in the relevant market for Pierce replacement parts. As a result of these agreements, the City of Providence has paid supracompetitive prices for replacement parts for its Pierce vehicles.

250. As a direct and proximate result of Defendants' agreements, Plaintiff has suffered injury to its property and has been deprived of the benefits of free and fair competition on the merits. Absent these agreements Plaintiff would have paid less for replacement parts.

251. Plaintiff seeks three times its damages caused by Defendants' violations of Section 6 of the Rhode Island Antitrust Act, the costs of bringing the suit, reasonable attorney fees, and a permanent injunction enjoining Defendants from ever again entering into similar agreements in violation of Section 6 of the Rhode Island Antitrust Act.

70

**COUNT 6 – AS TO ALL DEFENDANTS**
**Unjust Enrichment**
**in Violation of Rhode Island Common Law**

252.   Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1 through 251 above.

253.   Plaintiff has conferred a benefit upon Defendants in the form of orders for fire trucks and replacement parts.

254.   Defendants appreciated the benefit conferred on them by Plaintiff.

255.   Defendants accepted Plaintiff's benefit under circumstances that would be inequitable for Defendants to retain Plaintiff's benefit without paying the value thereof.

256.   Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred on them by overpayments by Plaintiff.

**VIII.  PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

A.   That Oshkosh's unlawful acquisition of Maxi-Métal Inc. be adjudged and decreed in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;

B.   That the unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Rhode Island Antitrust Act, Section 6-36-4;

C.   That the unlawful exclusive dealing alleged herein be adjudged and decreed in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14, and the Rhode Island Antitrust Act, Section 6-36-6;

D.   That Plaintiff recover damages, to the maximum extent allowed under the applicable laws, and that a joint-and-several judgment in favor of Plaintiff be entered against Defendants in an amount to be trebled to the extent permitted by law;

71

E.    That Defendants are permanently enjoined from engaging in similar and related conduct in the future;

F.    That the Court grant other such equitable relief, including but not limited to structural relief and disgorgement of ill-gotten profits, as the Court finds necessary to redress and prevent recurrence from Defendants' violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, as alleged herein.

## IX.  **JURY DEMAND**

Plaintiff demands a jury trial pursuant to Federal Rule of Civil Procedure 38(b) on any and all issues so triable.

Dated: June 11, 2026                                Respectfully Submitted,

**CITY OF PROVIDENCE**
By its Attorneys

Michael Kades (*Pro hac vice* forthcoming)
mkades@ntrial.com
Jeff Dan Herrera (*Pro hac vice* forthcoming)
jherrera@ntrial.com

Nachawati Law Group
5489 Blair Rd.
Dallas, TX 75231
Tel: (214) 890-0711

*/s/Jeffrey B. Pine*

Jeffrey B. Pine #2278
Lynch & Pine Attorneys at Law, LLC
1 Park Row, 5th Floor
Providence, Rhode Island 02903
Tel:  (401) 274-3306
jpine@lynchpine.com

***Attorneys for Plaintiff City of Providence***

72